301 P.3d 588

COUNTY OF HAWAI'I, a municipal corporation of the State of Hawai'i, Respondent/Plaintiff–Appellee,

v.

UNIDEV, LLC, a Delaware limited liability company, Petitioner/Defendant and Counterclaimant–Appellant,

v.

County of Hawai'i, a municipal corporation of the State of Hawai'i, Hawaii Island Housing Trust, a Hawai'i corporation; and Waikoloa Workforce Housing, LLC, a Hawai'i limited liability company, Respondents/Counterclaim Defendants–Appellees. (Civil No. 09–1–264K)

County of Hawai'i, a municipal corporation of the State of Hawai'i, Respondent/Plaintiff–Appellant,

v.

UNIDEV, LLC, a Delaware limited liability company, and UNIDEV Hawaii, LLC, a Delaware limited liability company, Petitioners/Defendants–Appellees. (Civil No. 10–1–427K)

No. SCWC–10–0000188.

Supreme Court of Hawai'i.

May 22, 2013.

Paul Alston, Maren L. Calvert, and Claire Wong Black, Honolulu, for petitioner.

Katherine A. Garson, Laureen L. Martin, Wailuku, and Joseph K. Kamelamela, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by ACOBA, J.

We hold first, that, Hawai'i Revised Statutes (HRS) § 658A–28(a) (Supp.2005),[2] which enumerates the appeals that "may" be taken from a court order concerning an arbitration proceeding, does not represent an exclusive list of appealable orders. Thus, although not listed in HRS § 658A–28(a), the order com-

pelling arbitration in the instant case, is sufficiently "final" under our collateral order doctrine to be appealable under the general civil matters appeal statute, HRS § 641–1 (Supp. 2005).[3] We therefore affirm the similar conclusion in the October 17, 2011 Order of the Intermediate Court of Appeals (ICA) Denying [the] September 19, 2011 Motion to Dismiss Appeal for Lack of Jurisdiction filed by Petitioners/Defendants–Appellees UniDev, LLC (UniDev) and UniDev Hawai'i, LLC (UniDev Hawai'i) (collectively, Petitioners). Second, we hold that under the circumstances of this case, the scope of the arbitration clause contained in the "Development Services Agreement" (DSA) between Respondent/Plaintiff–Appellant County of Hawai'i (Respondent) and UniDev encompassed all claims of Respondent and the counterclaims of Petitioners. To the extent that the ICA held otherwise, the ICA's August 31, 2012 opinion and October 18, 2012 judgment on appeal are vacated. The December 17, 2010 Order Granting Counterclaimant [UniDev's] Motion to Compel Alternative Dispute Resolution and to Stay Proceedings, and the January 3, 2011 Amended Order Granting Counterclaimant [UniDev's] Motion to Compel Alternative Dispute Resolution and to Stay Proceedings of the Circuit Court of the Third Circuit[4] (the court) are affirmed. This case is remanded to the court for further proceedings consistent with this opinion.

I.

A.

In April 2005, Respondent awarded UniDev a contract to develop an affordable hous-

---

**2.** HRS § 658A–28 provides as follows:

§ 658A–28 **Appeals.**
(a) An appeal may be taken from:
(1) An order denying a motion to compel arbitration;
(2) An order granting a motion to stay arbitration;
(3) An order confirming or denying confirmation of an award;
(4) An order modifying or correcting an award;
(5) An order vacating an award without directing a rehearing; or

(6) A final judgment entered pursuant to this chapter.
(b) An appeal under this section shall be taken as from an order or a judgment in a civil action.
(Emphases added.)

**3.** HRS § 641–1 provides in relevant part as follows:
(a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit and district courts and the land court to the intermediate appellate court, subject to chapter 602.
(Emphasis added.)

**4.** The Honorable Elizabeth A. Strance presided.

ing development project (the Project) in Waikoloa Village on the island of Hawai'i.[5] On March 2, 2006, the parties entered into the DSA. Under the DSA, UniDev agreed to construct "approximately 800 to 1,200" housing units in the Waikoloa area. Respondent initially owned the 288 acres of land that UniDev agreed to develop. However, pursuant to the DSA, Respondent would "transfer title to the [Property] to a to-be-formed nonprofit entity," and Respondent would "assign all of its rights and obligations in and under [the DSA] to [that nonprofit entity]."

The DSA also contained a provision regarding alternative dispute resolution. The parties agreed that if mediation of a dispute was not successful, the parties would proceed to arbitration under state law:

> Any dispute arising under the terms of this Agreement that is not resolved within a reasonable period of time by authorized representatives of [UniDev] and [Respondent] shall be brought to the attention of the Chief Executive Officer of [UniDev] and the Executive Director of [Respondent] for joint resolution. Thereafter, if the matter in dispute is still unresolved, then the parties shall in good faith mutually appoint a mediator to mediate the dispute, provided that if the parties cannot agree to a mediator, then either party may petition a court of competent jurisdiction to appoint a mediator. If the matter in dispute is still not resolved by mediation, then the parties shall submit the matter to arbitration as provided in the "Uniform Arbitration Act" under State law.

(Emphases added.)

As anticipated under the DSA, Respondent transferred title to the Property to Hawai'i Island Housing Trust (HIHT), which subsequently leased the Property to Waikoloa Workforce Housing, LLC (WWH). Respondent, HIHT, and WWH signed a "Develop-

ment Agreement," which provided, in part, that HIHT and WWH would develop the Project according to Respondent's requirements. Failure to do so would result in reversion of the Property to Respondent. Respondent then entered into an "Assignment and Assumption Agreement" (Assignment Agreement) with WWH, which stated in relevant part that Respondent "assigns unto [WWH] all right, title, and interest of [Respondent] in ... [the DSA]."

On February 21, 2008, UniDev and WWH entered into an "Amended and Restated Development Services Agreement" (ADSA). UniDev and WWH "wish[ed] to amend the DSA to reflect certain changes in facts and circumstances that [had] occurred since the DSA was first executed by [UniDev] and [Respondent]." Although the ADSA altered some aspects of the original agreement such as UniDev's compensation, the provision relating to alternative dispute resolution remained largely unchanged.

On April 19, 2009, WWH instructed UniDev to cease all work on the project. The Property was subsequently returned to Respondent.

**B.**

Following UniDev's termination from the Project, Respondent filed a Complaint on July 1, 2009 with the court. The case initiated by the Complaint was designated Civil No. 09–01–264K. The Complaint asserted five causes of action, including (1) false claims, in violation of HRS § 46–171 (Supp. 2001),[6] (2) intentional misrepresentation, (3) fraudulent inducement, (4) negligent misrepresentation, and (5) negligence.

On March 29, 2010, Petitioners answered Respondent's Complaint and filed a counterclaim against Respondent, HIHT, and WWH. Petitioners' counterclaim asserted four

---

5. The ICA's decision in this case consolidated two cases, CAAP–10–0000188 and CAAP–11–0000019.

6. HRS § 46–171 provides, in relevant part as follows:

> **§ 46–171 Actions for false claims to the counties; qui tam actions.**
> (a) Any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> . . . .
>
> shall be liable to the county for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages that the county sustains due to the act of that person.

counts, including (1) breach of contract (against Respondent and WWH), (2) quantum meruit (against Respondent and WWH), (3) intentional interference with contract (against Respondent), and (4) fraudulent transfer (against HIHT and Respondent).

On November 23, 2010, Respondent filed a second Complaint, initiating a second action against Petitioners, Civil No. 10–1–0427K. Respondent reiterated four of the five causes of action included in its original Complaint. Respondent again alleged causes of action for false claims pursuant to HRS § 46–171 (Count I), intentional misrepresentation (Count III), fraudulent inducement (Count IV), and negligent misrepresentation (Count V). Regarding all four causes of action, the second Complaint identified particular circumstances that constituted the bases of Respondent's allegations. Respondent also alleged a new cause of action for unfair and deceptive practices (Count II), declaring that Petitioners violated HRS §§ 480–2 (1993)[7] and 481A–3 (1993) by engaging in several acts.[8] On December 16, 2010, the parties stipulated to consolidate Civil No. 09–01–264K with Civil No. 10–1–0427K.[9]

## C.

On July 30, 2010, Petitioners filed their arbitration motion. On December 17, 2010, the court issued an Order granting the motion. The Order stated in relevant part as follows:

1. [Petitioners] ha[ve] established the existence of a written agreement that requires [Respondent] and [Petitioners] to resolve disputes by means of alternative dispute resolution. Specifi-

cally, Section 13 of Rider A of the [DSA] and Section 13 of Rider A of the [ADSA] both require the parties to resolve "any dispute arising under the terms of this Agreement" through the alternative dispute resolution process described therein. [Respondent] concedes that it validly executed the DSA, and as to the alternative dispute resolution provisions, the ADSA simply restates the DSA.

2. [Respondent's] claims fall within the scope of the alternative dispute resolution clause.... Alternative dispute resolution clauses must be broadly construed, and those covering claims "arising out of" the agreement have been held to require alternative dispute resolution of fraud-based claims concerning the subject matter of the agreement, as do [Respondent's] claims.

3. [Petitioners'] counterclaims against [Respondent] are also subject to the alternative dispute resolution provisions of the DSA and the ADSA, as [Petitioners] stated at the hearing. Some of the counterclaims are expressly based on the DSA and the ADSA, and others touch matters concerning the DSA and ADSA or arise out of the relationship between the parties created by those contracts.

(Emphases added.)

## II.

## A.

Respondent appealed to the ICA. After the parties had filed briefs on the merits, Pe-

---

7. HRS § 480–2 provides in relevant part as follows:

§ 480–2 **Unfair competition, practices, declared unlawful.**
(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

8. HRS § 481A–3 provides in relevant part as follows:

§ 481A–3 **Deceptive trade practices.**
(a) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:
(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
...
(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

9. Petitioners did not file an answer or counterclaims to the second complaint, apparently because the court's December 17, 2010 Order granting Petitioner's Motion to Compel Alternative Dispute Resolution (arbitration motion) stayed "all proceedings in this court."

titioners filed a Motion to Dismiss on September 19, 2011, arguing that the ICA lacked subject matter jurisdiction because the "appeal of an interlocutory order compelling arbitration is forbidden by the [Federal Arbitration Act (FAA)]." Petitioners acknowledged that "Hawaiʻi law allows appeals from interlocutory orders compelling arbitration under the collateral order doctrine when the issue of arbitrability is separable from and collateral to the claims asserted in the underlying case." (Citing *Sher v. Cella,* 114 Hawaiʻi 263, 266–67, 160 P.3d 1250, 1253–54 (App.2007).) However, according to Petitioners, "in disputes covered by the FAA—such as this one—that rule cannot apply."

In opposition, Respondent cited *Volt Info. Scis., Inc. v. Bd. of Trs.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), for the proposition that "where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, <u>even if the result is that arbitration is stayed where the act would otherwise permit it to go forward.</u>" (Emphasis in original.) Respondent noted that the arbitration clauses in both the DSA and ADSA explicitly stated that Hawaiʻi law applied; that, as Petitioners stated in their Answering Brief, "an immediate appeal of the order compelling arbitration is permitted under Hawaiʻi law;" and therefore, that the ICA had jurisdiction to hear the appeal.

On October 17, 2011, the ICA denied Petitioners' Motion to Dismiss. *County of Hawaiʻi v. Unidev LLC,* No. CAAP–11–0000019, 2011 WL 4998491, at *1 (App. Oct. 17, 2011) (*Unidev I*). The ICA related that under the FAA, "the courts and arbitrators must give effect to the contractual rights of the parties, that the parties' intentions control, that the parties may limit the issues that they choose to arbitrate, and that '<u>parties may agree on rules under which any arbitration will proceed.</u>'" *Id.* at *3 (quoting *Stolt–Nielsen, S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 1774, 176 L.Ed.2d 605 (2010)) (emphasis in original). "Under Hawaiʻi state

law, an order compelling arbitration is appealable under HRS § 641–1(a) [ (Supp. 2004) ] and the collateral order doctrine." *Id.* at *4 (citing *Sher,* 114 Hawaiʻi at 266–67, 160 P.3d at 1253–54; *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.,* 68 Haw. 98, 107, 705 P.2d 28, 35 (1985); *Luke v. Gentry Realty, Ltd.,* 105 Hawaiʻi 241, 246 n. 10, 96 P.3d 261, 266 n. 10 (2004); *Douglass v. Pflueger Hawaiʻi Inc.,* 110 Hawaiʻi 520, 522 n. 1, 135 P.3d 129, 131 n. 1 (2006)). Consequently, the ICA decided that it "ha[d] jurisdiction over [Respondent's] appeal from the December 17, 2010 order compelling alternative dispute resolution and the January 3, 2011 amended order compelling alternative dispute resolution." *Id.*

## B.

On May 25, 2011, Respondent filed its Opening Brief (OB) with the ICA. In pertinent part, Respondent argued (1) that it was not "required to arbitrate pursuant to the DSA [or] the ASDA," and (2) that its claims were not subject to arbitration.[10] Petitioners filed an Answering Brief (AB) on August 4, 2011. Respondent filed a Reply Brief on August 24, 2011.

### 1.

As to its first argument, Respondent contended that "the assignment of the DSA to WWH constituted a novation;" "the ADSA [thus] replaced the DSA" and as a result, "the DSA was discharged and [Petitioners could] not enforce the arbitration provision of the DSA against [Respondent]." Also, Respondent asserted that Respondent was not a party to the ADSA, and moreover WWH was not its agent when WWH entered into the ADSA because WWH possessed neither actual authority nor apparent authority to enter into the ADSA on its behalf.

Petitioners responded in their Answering Brief that the Assignment Agreement was an assignment, and not a novation, and as such, did not relieve Respondent from its duties

---

**10.** Respondent also argued that Petitioners waived their right to request arbitration. The ICA held that Petitioners did not waive their arbitration rights, and neither party has challenged that holding. *County of Hawaiʻi v. Unidev, LLC,* 128 Hawaiʻi 378, 405, 289 P.3d 1014, 1041 (App.2012) (*Unidev II*).

under the DSA; the ADSA did not constitute a substituted contract because the DSA itself contemplated amendment in that it stated "this Agreement shall remain in force with the inclusion of any such amendment"; and Respondent was bound under the ADSA's arbitration clause, despite not signing the ADSA, because Respondent "affirmed WWH's conduct and ratified the ADSA," and because Respondent "originally empowered WWH to act on its behalf."

## 2.

As to its second argument, Respondent pointed out that the arbitration clauses in the DSA and ADSA required arbitration for "any dispute arising under the terms of this Agreement," and that "[c]ourts in the Ninth Circuit and Hawai'i have held [that] similar language is 'relatively narrow,' and only mandates arbitration of claims which related to the interpretation of the contract and matters of performance." (Citing *Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp 2d 1179 (D.Haw.2009); *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir.1983); *Tracer Research Corp. v. National Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir.1994).)

Next, Respondent asserted that its claims were not based on Petitioners breaching either the DSA or ADSA, but instead, on Petitioners making fraudulent misrepresentations. Thus, its claims were "clearly actionable regardless of the existence of the DSA or ADSA," inasmuch as "the claims asserted by [Respondent] are clearly tort claims, and, as a result, d[id] not arise under the DSA or ADSA. . . ." Finally, Respondent declared that Petitioners' counterclaims were not subject to arbitration, because those "claims necessarily rely upon [Respondent] not being a party to the DSA or ADSA" and, therefore, none of Petitioners' four counterclaims "arose under the terms of the Agreement."

In their Answering Brief, Petitioners responded that Respondent's claims fell within the scope of both arbitration clauses; for clauses that require the party to arbitrate "any dispute arising under the terms of this Agreement" have been consistently construed as "broad." Thus, Petitioners asserted that the arbitration clauses in the DSA and ADSA covered any claims that "touch matters covered by the parties' contract" or that "have their roots in the relationship created by the contract." (Citing *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 836–37 (8th Cir.2010); *Int'l Asset Mgmt., Inc. v. Holt*, 487 F.Supp.2d 1274, 1288 (N.D.Okla.2007).) According to Petitioners, the cases cited by Respondent represented " 'a distinct minority analysis,' " (quoting *EFund Capital Partners v. Pless*, 150 Cal.App.4th 1311, 59 Cal.Rptr.3d 340, 341 (2007)), that the "majority of federal courts have 'declined to follow.' " (Quoting *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).)

Additionally, Petitioners maintained that Respondent's causes of action fell within the arbitration clauses because either they "require[d] interpretation of [ ] the DSA and [ADSA]" or because the claims would not have occurred "unless the DSA and [ADSA] existed." Regarding Petitioners' counterclaims, Petitioners claimed that their "relationship with [Respondent] arises out of[,] and would not have existed without the DSA." "Thus," Petitioners urged, "any claims related to that relationship arise out of and are related to the DSA."

## III.

### A.

The ICA held, regarding Respondent's first argument, that Respondent was bound by the DSA, but not the ADSA. As to the DSA, the ICA ruled that because neither the Assignment Agreement nor the ADSA was a novation with regard to the DSA, Petitioners did not agree to the discharge of Respon-

dent's duties under the DSA in either document. *Unidev II*, 128 Hawai'i at 396, 289 P.3d at 1032. Therefore, the ICA concluded that Respondent was bound by the DSA's arbitration provision. *Id.*

However, with respect to the ADSA, the ICA decided that Respondent "was not a signatory" and Respondent neither gave WWH the authority to bind it to the ADSA nor ratified the ADSA. *Id.* at 397–98, 289 P.3d at 1033–34. Therefore, the ICA concluded that the court "erred in determining that the ADSA arbitration agreement applies to [Respondent]." *Id.*

## B.

Regarding Respondent's second argument, the ICA analyzed each cause of action alleged in the complaints and the counterclaims. The ICA observed that a split in authority existed as to whether clauses that mandated arbitration for disputes "arising under" or "arising out of" an agreement were broad or narrow. *Id.* at 399, 289 P.3d at 1035. However, the ICA did "not decide that particular issue because the arbitration provision ha[d] further limiting language," specifically that arbitration was mandatory for disputes "arising under *the terms* of the agreement." *Id.* (emphasis in original). According to the ICA, "[e]ven though public policy strongly favors arbitration, the scope of arbitration ultimately depends on the wording of the contract." *Id.* (citing *Hawai'i Med. Ass'n v. Hawai'i Med. Serv. Ass'n*, 113 Hawai'i 77, 92, 148 P.3d 1179, 1194 (2006)).

The ICA explained that "[b]y choosing the specific and clear language in the DSA arbitration provision, the parties indicated their intent to require arbitration when a dispute implicates or involves the terms of the DSA."

Id. (emphasis added). Hence, "arbitration [was] required for claims that involve construction or interpretation of the DSA's terms, or that require a determination of the parties' rights and/or obligations under the terms of the DSA." *Id.* Applying its interpretation of the DSA's arbitration clause, the ICA held that Respondent's negligence claim in its first complaint was subject to the arbitration clause, as was Petitioners' counterclaim for breach of contract "to the extent [that it alleged] that [Respondent] breached the DSA." *Id.* However, the remainder of Respondent's claims and Petitioners' counterclaims did not "involve the terms of the DSA," and therefore were not within the scope of the DSA's arbitration clause. *Id.*

## IV.

In their Application, Petitioners ask (1) whether this court's decision in *Swinerton* was "nullified by the adoption of the [Revised Uniform Arbitration Act (RUAA)]," (2) whether the ICA erred by "adopting the minority view regarding [the] 'arising under' language" in the arbitration provisions and "drastically narrow[ing] the scope of the parties' arbitrable claims," and (3) whether it was grave error to exclude Respondent's claims and Petitioners' counterclaims from arbitration. Respondent filed a Response on December 31, 2012. Petitioners filed a Reply on January 7, 2012.

## V.

■ As an initial matter, neither party challenges the ICA's conclusion that Respondent is bound by the arbitration clause of the DSA. *Unidev II*, 128 Hawai'i at 396, 289 P.3d at 1032. Therefore, Respondent is bound by the arbitration clause in the DSA.[11]

---

11. Respondent did object to the ICA's holding regarding the DSA at oral argument. However, Respondent did not cross-appeal the holding of the ICA or raise this issue in its Response. Thus, it has been waived. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1. In any event, it appears that the ICA correctly rejected Respondent's arguments that neither the Assignment Agreement nor the ADSA effected a novation and discharged Respondent's obligations under the DSA. As the ICA recognized, Petitioners' assent to the discharge of Respondent's duties under the

DSA was required to effectuate a novation. Restatement (Second) of Contracts § 280 cmt. d ("For a novation to take place, the obligee must assent to the discharge of the obligor's duty in consideration for the promise of the third party to undertake that duty.") (emphasis added); *see also Hawai'i Builders Supply Co. v. Kaneta*, 42 Haw. 111 (Haw.Terr.1957) ("[D]ischarge of a previous contractual duty is one of the essential elements of a novation."). The ICA observed nothing in the record that indicated Petitioners agreed to discharge Respondent from its duties under the DSA.

■ Petitioners argue that the ICA erred by holding that Respondent was not bound by the arbitration provision in the ADSA, because the ICA allowed "[Respondent] to use the ADSA as both a sword and shield." [12] Respondent is "bound to arbitrate," Petitioners urge, because its claims "allege breaches under the ADSA and therefore arise under ... the ADSA." [13] This argument, however, is unrelated to any of the questions presented for decision by Petitioners. The first question presented, regarding the ICA's jurisdiction, does not address the ADSA at all. The second and third questions presented, regarding the ICA's interpretation of the scope of the arbitration agreement, also apparently do not address the ADSA, because the ICA held that only the DSA applied to Respondent, and therefore the ICA did not address the ADSA's scope at all. *See Unidev II*, 128 Hawai'i at 398, 289 P.3d at 1034 ("We now consider whether <u>the scope of the DSA's arbitration provision</u> covers the claims and counterclaims asserted by the parties.") (emphasis added). Pursuant to HRAP Rule 40.1(d)(1), "[t]he application for a writ of certiorari shall contain ... a short and concise statement of the questions presented for decision," and "[q]uestions not presented according to this paragraph will be disregarded." Petitioners' argument regarding the applicability of the ADSA is unrelated to any of the questions presented. Hence, under Rule 40.1(d)(1) Petitioners' arguments are disregarded. The ICA's holding that Re-

spondent is not bound by the ADSA is affirmed.

Further, Petitioners did not argue below that Respondent was bound by the arbitration clause in the ADSA. At oral argument, Petitioners contended that they "raised the ratification argument" at every stage of the proceedings. To the contrary, before the court and before the ICA, Petitioners argued that by asserting claims under the ADSA, Respondent ratified WWH's signing of the ADSA as a part of an <u>agency</u> theory. All of the cases cited by Petitioner related to agency status.[14] The ICA rejected Petitioners' ratification argument because Petitioners could not demonstrate "that WWH entered into the ADSA on behalf of Respondent." *Unidev II*, 128 Hawai'i at 397, 289 P.3d at 1034; *see also Stillson*, 108 Hawai'i at 30, 116 P.3d at 672 (noting that ratification is defined as "the affirmance by a person of a prior act which did not bind him <u>but which was done or professedly done on his account</u>") (emphasis added).

■ Before this court, Petitioners did not challenge the ICA's determination that Petitioners could not prove that WWH was acting on behalf of Respondent. Instead, Petitioners cited cases that suggested Respondent was bound by the ADSA's arbitration clause solely because Respondent asserted claims under the ADSA. The analysis in the cases cited does not utilize an agency theory, but instead one of estoppel.[15] Thus, Petitioners raise their estoppel

---

12. Petitioners' Application does not explain why the question of whether or not Respondent is bound by the ADSA is relevant to the ultimate disposition of the case. Whether Petitioners are bound by the arbitration clause in the ADSA may have been relevant under the ICA's holding that arbitration clauses in the DSA and ADSA extend only to claims requiring "construction or interpretation" of the terms of those agreements. *Unidev II*, 128 Hawai'i at 399, 289 P.3d at 1035. Presumably, some of Respondent's claims and Petitioners' counterclaims may have implicated the terms of the ADSA, but not the DSA. Therefore, under the ICA's interpretation of the scope of the arbitration clauses in the DSA and ADSA, some claims may have been subject to arbitration only if the Respondent was subject to the ADSA. However, as discussed *infra*, the ICA erred regarding the scope of the arbitration clauses in the DSA and ADSA.

13. Petitioners point to Count 1 of Respondent's first complaint, which alleged that Petitioners submitted to Respondent invoices that Respondent was not contractually obligated to pay, and even if Respondent was obligated to pay, those invoices "request payment for amounts that <u>even under the ADSA</u> ... would not be due to [Petitioners]." (Emphasis added.) Petitioners claim that this citation to the ADSA "requires interpretation of the ADSA's payment provisions."

14. *See, e.g., Hawai'i County v. Purdy*, 22 Haw. 272, 283 (Haw.Terr.1914) ("A municipal corporation <u>may ratify</u> the unauthorized acts <u>of its agents or officers</u> ....") (emphases added); *Ass'n of Apartment Owners of Maalaea Kai, Inc. v. Stillson*, 108 Hawai'i 2, 30, 116 P.3d 644, 672 (2005) ("Ratification rests on principles of agency.").

15. *See, e.g., Boucher v. Alliance Title Company, Inc.*, 127 Cal.App.4th 262, 25 Cal.Rptr.3d 440,

theory for the first time before this court. It is axiomatic that where a party fails to raise an argument before the courts below, that argument may be deemed waived for purposes of appeal. *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003). Hence, we consider Petitioners' estoppel argument waived.

## VI.

### A.

As to the first Application question, Petitioners contend, contrary to their position before the ICA, that Hawai'i law does <u>not</u> permit interlocutory appeals from orders compelling arbitration. According to Petitioners, this court's decision in *Swinerton*, 68 Haw. at 107, 705 P.2d at 34, which allowed interlocutory appeals from orders denying and compelling arbitration, is no longer applicable in light of the adoption of the RUAA.

▉ Petitioners maintain that at the time *Swinerton* was decided, Hawai'i's arbitration statute was "silent with regard to appeals of orders concerning arbitration." Thus, "the *Swinerton* decision properly turned upon general principles of appealability." Peti-

tioners read *Swinerton* as holding that under the "collateral order doctrine," [16] the Hawai'i general appeals statute, HRS § 641–1(a) (1993) [17], allowed "interlocutory appeals from orders denying arbitration as well as orders compelling arbitration." (Citing *Swinerton*, 68 Haw. at 107, 705 P.2d at 35.)

Petitioners state, however, that "fifteen years after *Swinerton*, the Hawai'i legislature adopted the RUAA," and under the RUAA, "HRS § 658A-[2]8 permits appeals of orders <u>denying</u> arbitration," but "does not authorize appeals challenging orders <u>compelling</u> arbitration." [18] (Emphases in original.) That "omission is significant," according to Petitioners, "for 'this court has consistently applied the rule of <u>expressio unius est exclusio alterius</u>—the express inclusion of a provision in a statute implies the exclusion of another—in interpreting statutes.'" (Quoting *Fought & Co. v. Steel Eng'g*, 87 Hawai'i 37, 55, 951 P.2d 487, 505 (1998).) (Brackets omitted.) Therefore "it would be contrary to the canons of interpretation to read the grant of appellate jurisdiction in one instance but not the other as granting appellate jurisdiction in both." Additionally, Petitioners declare that "upholding *Swinerton* would [ ]

---

444 (2005) ("Here, defendant relies <u>only</u> on equitable estoppel principles.")(emphasis added); *Int'l Ins. Agency Services, LLC v. Revios Reins. U.S., Inc.*, 2007 WL 951943 (N.D.Ill. Mar. 27, 2007) ("Because it proves to be dispositive, the court considers <u>only</u> the estoppel theory.") (emphasis added). Estoppel and agency are two <u>different</u> theories which may be used to bind a non-signatory to an arbitration agreement. *See Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995).

**16.** The collateral order doctrine allows appeals from orders "falling in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Swinerton*, 68 Haw. at 105, 705 P.2d at 35 (citations omitted).

**17.** At the time of *Swinerton*, HRS § 641–1(a) (1985 Repl.) provided as follows:

(a) <u>Appeals shall be allowed in civil matters from all final judgments, orders, or decrees</u> of circuit and district courts and the land court, to the supreme court or to the intermediate appellate court, except as otherwise provided by law and subject to the authority of the

intermediate appellate court to certify reassignment of a matter directly to the supreme court and subject to the authority of the supreme court to reassign a matter to itself from the intermediate appellate court.
(Emphasis added.)
HRS § 641–1(a) was subsequently amended to require that appeals be heard by the ICA. To reiterate, HRS § 641–1(a) now provides as follows:

(a) <u>Appeals shall be allowed in civil matters from all final judgments, orders, or decrees</u> of circuit and district courts and the land court to the intermediate appellate court, subject to chapter 602.
(Emphasis added.)

**18.** Petitioners acknowledge that twice since the adoption of the RUAA, this court has restated its holding in *Swinerton* that appeals are allowable under the collateral order doctrine. (Citing *Luke*, 105 Hawai'i at 246, 96 P.3d at 266 n. 10; *Douglass*, 110 Hawai'i at 522, 135 P.3d at 131 n. 1 (2006).) However, Petitioners explain that the RUAA, which applies only to contracts made "on or after July 1, 2002," HRS § 658A–3 (Supp. 2011), did not govern those cases because the contracts at issue were entered into prior to 2002.

contravene the legislature's intent since it is presumed to have known of [this c]ourt's decision in *Swinerton* when it decided to grant appellate jurisdiction only as to orders denying arbitration." (Citing *State v. Reis*, 115 Hawai'i 79, 97, 165 P.3d 980, 998 (2007).) (Emphases in original.)

Also, Petitioners assert that the majority of jurisdictions adopting the RUAA do not allow appeals from orders compelling arbitration. Hence, this court must "interpret and construe the RUAA as to effectuate [the RUAA's] general purpose to make uniform the laws of the states and territories which enacted [it]." (Citing HRS § 1-24 (Repl. 2003).) [19] Finally, Petitioners maintain that allowing appeals from orders compelling arbitration will "encourage[ ] delays, add[ ] costs, and wast[e] judicial resources and the parties resources."

### B.

#### 1.

Respondent responds first, that Petitioners have waived the argument that Hawai'i law forbids appealing orders that compel arbitration, by not raising that issue before the ICA. "It is well established," Respondent maintains, "that an issue raised for the first time on appeal will not be considered by the reviewing court." (Citing *State v. Schnabel*, 127 Hawai'i 432, 478-79, 279 P.3d 1237, 1283-84 (2012); *State v. Wallace*, 80 Hawai'i 382, 410, 910 P.2d 695, 723 (1996).) According to Respondent, because Petitioners asserted before the ICA that Hawai'i law did permit an appeal, "[Petitioners] argued the opposite of what [they] now argue." Thus, inasmuch as

HRS § 602-59 [20] only allows this court to review "clearly wrong" decisions by the ICA, and "the ICA never decided this issue ... there is nothing for this [c]ourt to correct." Further, Respondent declares that if it must proceed through arbitration and subsequently appeal the court's ruling compelling arbitration, "[t]he ICA would then render the same decision" regarding the merits of the claims, resulting in "meaningless duplication and wasteful actions."

#### 2.

In answer to Petitioners' position that the RUAA supplants this court's decision in *Swinerton*, Respondent posits that "HRS § 641-1(a) provides additional authority for appeals." Respondent cites the ICA's decision in *Picardy v. Sky River Mgmt., LLC.*, No. 29824, 2009 WL 4988294 (App. Dec. 21, 2009) (order),[21] in which the defendant moved to dismiss an appeal from an order compelling arbitration, arguing that "HRS § 658A-28 did not permit an appeal [from such] an order...." The ICA, however, ruled that "HRS § 641-1(a) provides additional authority for appeals and authorizes appeals from judgments, orders, or decrees." (Citing *Picardy*, 2009 WL 4988294 at *1.) (Emphasis added.) Applying this court's decision in *Swinerton*, the ICA held that "orders granting stays of arbitration are appealable final orders." (Citing *Picardy*, 2009 WL 4988294 at *2.)

Relying on *Picardy*, Respondent contends that "several other jurisdictions [ ] have noted [that] similar statutes ... do not represent an exclusive list of appealable orders." [22]

---

**19.** HRS § 1-24 provides as follows:

§ 1-24 **Interpretation of uniform acts.**
All provisions of uniform acts adopted by the State shall be so interpreted and construed as to effectuate their general purpose to make uniform the laws of the states and territories which enact them.

**20.** HRS § 602-59 provides in relevant part as follows:

(b) The application for writ of certiorari shall tersely state its grounds, which shall include:
(1) Grave errors of law or of fact; or
(2) Obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its

own decision, and the magnitude of those errors or inconsistencies dictating the need for further appeal.

**21.** Respondent argues that *Picardy* is a decision of this court. Westlaw has published the opinion as from the "Supreme Court of Hawai'i." *Picardy*, 2009 WL 4988294. However, *Picardy* is an ICA decision.

**22.** Respondent cites *Kremer*, 788 N.W.2d at 547-48; *Wein v. Morris*, 194 N.J. 364, 944 A.2d 642, 651 (2008); *Gilliland v. Chronic Pain Assocs., Inc.*, 904 P.2d 73, 77 (Okla.1995); and *Collier v. Pennington*, 133 N.M. 728, 69 P.3d 238, 240 (N.M.App.2003).

Those jurisdictions recognize that "permitting appeals of orders compelling arbitration is logical and just since 'these claims cannot be effectively vindicated after the party has been compell[ed] to do that which it claims it is not required to do.'" (Citing *Kremer v. Rural Comm. Ins. Co.*, 280 Neb. 591, 788 N.W.2d 538, 549 (2010).) Respondent explains that "delaying the appeal until after arbitration requires the parties to engage in a useless arbitration proceeding if the order compelling arbitration was improper." (Citing *Evansville–Vanderburgh Sch. Corp. v. Evansville Teachers Ass'n*, 494 N.E.2d 321, 322–23 (Ind.App.1986).) [23]

## VII.

■ As an initial matter, Respondent's contention that Petitioners have waived their argument that Hawaiʻi law does not permit appeals from an order compelling arbitration is incorrect. "If a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid." *Bush v. Hawaiian Homes Comm'n*, 76 Hawaiʻi 128, 133, 870 P.2d 1272, 1277 (1994). Therefore, "such a question is <u>valid at any stage of the case</u>." *Id.* (emphasis added). In other words, "[t]he lack of jurisdiction over the subject matter cannot be waived by the parties." *In re Rice*, 68 Haw. 334, 335, 713 P.2d 426, 427 (1986). Hence, Petitioners cannot have waived their argument that the ICA lacked jurisdiction to hear an appeal.

■ Respondent also argues that "the ICA never decided" the issue of whether the ICA had jurisdiction under Hawaiʻi law and therefore, "there is nothing to correct." However, as discussed *supra*, a jurisdictional question can be raised at any point in the proceedings. Therefore, whether or not the ICA's opinion contained error is not controlling; the lack of jurisdiction can be raised for the first time before this court. Additionally, Respondent's assertion that the ICA "never decided th[e] issue" is wrong. The ICA held

that "[u]nder Hawaiʻi state law, an order compelling arbitration is appealable under HRS § 641–1(a) and the collateral order doctrine." *Unidev I*, 2011 WL 4998491 at *4. Finally, if a court lacks jurisdiction, "any judgment rendered in that proceeding is invalid," *Bush*, 76 Hawaiʻi at 133, 870 P.2d at 1277, and any opinion in the case "is a nullity." *State by Kanbara v. Hilo Metals Co.*, 53 Haw. 642, 644, 500 P.2d 743, 745 (1972) ("[T]he district court lacked jurisdiction ... and the district court's judgment ... is a nullity."). Hence, Respondent's claim that the ICA's opinion renders the issue of the ICA's jurisdiction to hear the case moot lacks merit, because if the ICA lacked jurisdiction to hear the case, that opinion "is a nullity." *Id.*

## VIII.

### A.

■ In HRS § 658A–28, which adopted the RUAA appeals provision, the legislature expressly enumerated six circumstances in which an interlocutory appeal may be taken from proceedings related to arbitration. Although the statute specifically allows for appeals from "[a]n order <u>denying</u> a motion to compel arbitration," it is silent as to the appeilibility of orders granting a motion to <u>compel</u> arbitration. HRS § 658A–28 (emphasis added). Under the canon of <u>expressio unius est exclusio alterius</u>, "the mention of one thing implies the exclusion of another." *Int'l Sav. and Loan Ass'n v. Wiig*, 82 Hawaiʻi 197, 201, 921 P.2d 117, 121 (1996). However, this canon applies "only where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute." *Id.*

There is a "natural association of ideas" between an order denying a motion to compel arbitration and an order granting a mo-

**23.** In Reply, Petitioners argue that they cannot have waived their jurisdictional argument because "[t]he ICA's improper exercise of appellate jurisdiction is a grave error of law that may be raised at any time." (Citing *Hous. Fin. & Dev. Corp. v. Castle*, 79 Hawaiʻi 64, 76, 898 P.2d 576, 588 (1995).) Also, Petitioners reiterate that "[a]llowing only interlocutory appeals of orders denying arbitration ... allow[s] arbitration to proceed [ ] without unnecessary delay." (Citing *Gepaya v. State Farm Mut. Auto. Ins. Co.*, 94 Hawaiʻi 362, 365, 14 P.3d 1043, 1046 (2000).)

tion to compel arbitration, because both involve the circuit court's decision regarding a motion to compel arbitration. Hence, the failure to include an order granting a motion to compel arbitration in the list of appealable orders in HRS § 658A–28 may suggest that the legislature did not intend to allow such appeals. *See, e.g., Chem–Ash, Inc. v. Arkansas Power and Light Co.,* 296 Ark. 83, 751 S.W.2d 353, 354 (1988) (interpreting an identical statute and holding that "[c]learly, if the legislature had intended to deny or delay arbitration by permitting an appeal from an order compelling arbitration, it would have said so. The act only states that an appeal can be taken from an order denying an application to compel arbitration."); *Clark Cnty. v. Empire Elec., Inc.,* 96 Nev. 18, 604 P.2d 352, 353 (1980) (interpreting an identical statute and holding that "the fact that the Legislature saw fit to specify in one code section the different orders and judgment from which appeals may be taken clearly indicates, in our opinion, an intention to restrict the appeals in such proceeding to orders and judgment therein specified").

█ However, HRS § 658A–28 and HRS § 641–1 are both statutes regarding the courts' jurisdiction to hear appeals. It is well settled that "where there is a plainly irreconcilable conflict between a general and a specific statute concerning the same subject matter, the specific will be favored." *State v. Hussein,* 122 Hawai'i 495, 525, 229 P.3d 313, 343 (2010). If, however, "the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." *Id.* Clearly, HRS § 658A–28, which addresses appealability in the limited context of arbitration, is the specific statute, and HRS § 641–1, which addresses appealability generally, is the general statute. Thus, should the two statutes conflict, HRS § 658A–28 would control over HRS § 641–1.

█ Two statutes conflict where "it is not possible to give effect to both." *Schnabel,* 127 Hawai'i at 448, 279 P.3d at 1253 (2012). Under *Swinerton,* HRS § 641–1 permits appeals from orders compelling arbitration, while, as discussed *supra,* HRS § 658A–28 may not. Thus, the two statutes may conflict if HRS § 658A–28 provides an exclusive enumeration of the issues related to arbitration that may be appealed.

### B.

█ But nothing in the text of HRS § 658A–28 indicates that its list of appealable orders is exclusive. To the contrary, the plain meaning of the text demonstrates that HRS § 658A–28 may be read in conjunction with the general appeals statute, HRS § 641–1. *See State v. Ribbel,* 111 Hawai'i 426, 431, 142 P.3d 290, 296 (2006) ("Where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning."). HRS § 658A–28 states that "an appeal <u>may</u> be taken from" six different types of orders. HRS § 658A–28 (emphasis added.) The word "may" is defined as "(1) to have the ability to; (2) to have permission to; (3) to be free to." *Merriam Webster's Collegiate Dictionary* 718–19 (10th ed. 1993). By declaring that an appeal "may" be taken from the enumerated statutes, then, the statute indicates that litigants "have permission to," *inter alia,* appeal the orders listed in HRS § 658A–28. There is no indication in the statutory language, then, that the "permission" to appeal certain orders such as an order denying a motion to compel arbitration <u>precludes</u> the appeal of an order granting a motion to compel arbitration pursuant to HRS § 641–1. Therefore, "effect can be given to both" HRS § 658A–28 and HRS § 641–1. In other words, HRS § 658A–28 poses "no hurdle" to an appeal under HRS § 641–1. *See Gilliland,* 904 P.2d at 78 ("[W]e view [the Uniform Arbitration Act (UAA) appeals provision] as no hurdle to [an appeal under the state's final judgment statute.]").[24]

### C.

This interpretation of HRS § 658A–28 is consistent with the approach followed in the majority of cases cited by Petitioners and

---

**24.** The ICA reached the same conclusion in *Picardy,* holding that "HRS § 641–1 provides additional authority for appeals, authorizing appeals to the [ICA] from final judgments, orders, or decrees." 2009 WL 4988294 at *1.

Respondent. As Respondent notes, several other jurisdictions that have enacted either the UAA or the RUAA permit appeals from orders compelling arbitration. They view appeals statutes based on either the UAA[25] or the RUAA[26] as non-exclusive, because those statutes "lay[ ] no textual pretense to exclusivity in [their] application to arbitration related appeals." *Gilliland,* 904 P.2d at 77–78. Rather, those courts treat the RUAA appeals provision as "no more than a litany of orders—all typically occurring in litigation over arbitration—which in addition to more mainstream rulings, are to be treated as appealable." *Id.* at 78 (emphasis added).[27] Such jurisdictions also recognize that it would be fundamentally unfair to "require a party who has not agreed to arbitrate a particular dispute … to arbitrate it." *Kremer,* 788 N.W.2d at 549.

Even in the majority of the decisions cited by Petitioners, courts do not conclude that statutes based on the UAA or RUAA are exclusive. Instead, those decisions conclude that (1) orders compelling arbitration are not listed under the RUAA appeals provision, and (2) that the appealability of orders compelling arbitration "must also be examined" under that jurisdiction's general appeals statute. *Chem–Ash,* 751 S.W.2d at 354 (holding that "[c]learly, if the legislature had intended to deny or delay arbitration by permitting an appeal from an order compelling arbitration, it would have said so," but also holding that "[e]ven so, the trial court's order must also be examined in light of Rule 2(a) of the Arkansas Rules of Appellate Procedure, which governs the appealability of lower court orders." (emphasis added)).[28] Consequently, even the states that hold orders

25. The UAA appeals section is virtually identical to the RUAA appeals section. The UAA section governing appeals provides as follows:

**§ 19 Appeals.**
(a) An appeal may be taken from:
(1) An order denying a motion to compel arbitration made under Section 2;
(2) An order granting a [motion] to stay arbitration made under Section 2(b);
(3) An order confirming or denying confirmation of an award;
(4) An order modifying or correcting an award;
(5) An order vacating an award without directing a rehearing; or
(6) A judgment or decree entered pursuant to the provisions of this act.
(b) An appeal under this section shall be taken as from an order or a judgment in a civil action.

26. HRS § 658A–28 is adopted verbatim from the RUAA. The RUAA section governing appeals provides as follows:

**§ 28 Appeals.**
(a) An appeal may be taken from:
(1) An order denying a [motion] to compel arbitration;
(2) An order granting a [motion] to stay arbitration;
(3) An order confirming or denying confirmation of an award;
(4) An order modifying or correcting an award;
(5) An order vacating an award without directing a rehearing; or
(6) A final judgment entered pursuant to this [Act].
(b) An appeal under this section shall be taken as from an order or a judgment in a civil action.

27. Other jurisdictions that permit appeals from orders compelling arbitration based on an interpretation of similar provisions as being non-exclusive are *Kremer,* 788 N.W.2d at 547–48; *Wein v. Morris,* 194 N.J. 364, 944 A.2d 642, 651 (2008); and *Collier v. Pennington,* 133 N.M. 728, 69 P.3d 238, 240 (N.M.App.2003).

28. Other cases cited by Petitioners that address both the appeals provision in the UAA or RUAA and that jurisdiction's general appeals statute before holding that orders compelling arbitration are not appealable are *Powell v. Cannon,* 179 P.3d 799, 803, 805–806 (Utah 2008) (holding that orders granting arbitration could not be appealed under the RUAA's appeals provision only after holding that "an order compelling arbitration and staying litigation is not final" under Utah's final judgment statute); *Harris v. State Farm Mut. Auto. Ins. Co.,* 283 So.2d 147, 148–49 (Fla.App.1973) (holding that an "order granting a motion or application to compel arbitration is non-appealable," because it is not listed in the UAA arbitration provision and because "it is not a final order"); *Fayette Cnty. Farm Bureau Fed'n. v. Martin,* 758 S.W.2d 713 (Ky.App.1988) (holding that an order compelling arbitration is not appealable because it is not listed in the UAA statute and because it is not final); *Maleski v. Mutual Fire, Marine, and Inland Ins. Co.,* 534 Pa. 575, 633 A.2d 1143, 1145–46 (1993) (holding that an order compelling arbitration is not immediately appealable because it is not final and because it is not listed in the UAA appeals provision); *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC,* 93 S.W.3d 861, 864–65 (2002) (holding that the UAA appeals statute is a "limited exception" to Tennessee's general appeals statute); *cf. Ginsburg v. Pritchard,* —— N.C.App. ——, 2012 WL 4078421 (N.C.App. Sept. 18,

compelling arbitration are not appealable recognize that the RUAA's appeals provision is non-exclusive.[29]

Therefore, in consonance with the decisions of the majority of jurisdictions that have adopted either the UAA or RUAA's appeals provision, HRS § 658A–28 represents a non-exclusive list of appealable orders. In that regard, HRS § 641–1, Hawai'i's final judgment statute, allows appeals from "all final judgments, orders or decrees." To reiterate, under the collateral order doctrine, "orders ... compelling arbitration are appealable final orders." *Swinerton*, 68 Haw. at 107, 705 P.2d at 35 (emphasis added). In sum, after Hawai'i's adoption of HRS § 658A–28, orders compelling arbitration remain appealable under Hawai'i's final judgment statute, HRS § 641–1. *Gilliland*, 904 P.2d at 78. Thus, the ICA's holding that

it had jurisdiction to hear Respondent's appeal was not in error.

### D.

The Commentary to the RUAA does not address the RUAA section on appeals. The Prefatory Note to the RUAA does state that the RUAA "revis[ed] the original [UAA] in light of the increasing use of arbitration, the greater complexity of many disputes resolved by arbitration, and the developments of the law in this area." Prefatory Note to the RUAA. In other words, the RUAA is a "revision of the UAA." *Id.* The Prefatory Note to the original UAA explained that "[t]he section on Appeals is intended to remove doubts as to what orders are appealable and to limit appeals prior to judgment as to those instances where the element of finality is present." Prefatory Note to the UAA.[30]

2012) (unpublished) ("[O]ur Court has consistently held that 'an order compelling the parties to arbitrate is an interlocutory order.' "); *Teufel Const. Co. v. American Arbitration Ass'n*, 3 Wash. App. 24, 472 P.2d 572, 573 (1970) (holding that orders compelling arbitration are not appealable not because of the UAA appeals provision, but because "[i]t has been definitely settled by the Supreme Court of this state that an order compelling arbitration is not final and therefore is not appealable.").

**29.** At oral argument, Petitioners stated that "forty-nine" jurisdictions have adopted the UAA or RUAA, and of those jurisdictions "about forty-one" do not allow appeals from orders compelling arbitration. Petitioner cited as authority the American Law Reports annotation on orders compelling arbitration. *See* Annotation, *Appealability of State Court's Order or Decree Compelling or Refusing to Compel Arbitration*, 6 A.L.R.4th 652 (Originally published in 1981). Petitioner apparently was citing the Prefatory Note to the RUAA, which stated that "forty-nine jurisdictions have arbitration statutes, 35 of those have adopted the UAA and 14 have adopted substantially similar legislation." Prefatory Note to the RUAA.

But, confusion apparently exists as to which jurisdictions have not adopted the UAA. *Compare Birmingham News Co. v. Horn*, 901 So.2d 27, 45 (Ala.2004) ("Presumably Alabama is the excluded 50th jurisdiction, it being self-evident that the [Alabama Arbitration Act] is in no wise [sic] 'substantially similar' to the UAA") *with* Committee on Arbitration, Association of the Bar of the City of New York, et al. *Report on the Revised Uniform Arbitration Act* ("New York is the one state that did not formally adopt the UAA."); *see also* Stephen Wills Murphy, Note, *Judicial Re-*

*view of Arbitration Awards Under State Law*, 96 Va. L.Rev. 887, 891 n. 15 (stating that Alabama, New Hampshire, and West Virginia "have adopted arbitration statutes whose systems of judicial review are not based on the Federal or Uniform Acts"). Moreover, even the jurisdictions with "substantially similar legislation" often utilize differing appeals provisions. For example, nine states have "adopted arbitration statutes based on the [FAA]." Murphy, *Judicial Review of Arbitration Awards Under State Law*, 96 Va. L.Rev. at 891. The FAA's appeals provision contains explicit language regarding orders compelling arbitration. Consequently, Petitioner's statement does not clarify how many states have adopted statutes similar to HRS § 658A–28.

Second, in the ALR article identified by Petitioner, decisions from twenty UAA or RUAA states (Arizona, Arkansas, Colorado, Florida, Kentucky, Maine, Massachusetts, Maryland, Minnesota, Missouri, Nevada, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Utah, Virginia, Washington, and Wyoming) are cited as refusing to allow appeals from orders compelling arbitration. 6 A.L.R. 4th at § 3[b]–3[c]. Of those twenty states, decisions from nineteen states (all but Nevada) are cited as "based in whole or in part upon the consideration that the particular order lacked such finality as to fall within the purview of a statute or rule of practice authorizing appeals from final orders or judgments." *Id.* at § 3[b] (emphasis added). Hence, even under the authority cited by Petitioner, the clear majority of states do not consider the UAA or RUAA appeals provision to be exclusive.

**30.** Neither the UAA nor RUAA establishes the weight to be given to either the Commentary or the Prefatory Note in interpreting those acts.

It had been held that in order to ensure that the appeals section of the UAA has the intended effect of "remov[ing] doubts as to what orders are appealable," that section must be read as an exclusive list of appealable orders. *See S. California Edison Co. v. Peabody Western Coal Co.,* 194 Ariz. 47, 977 P.2d 769, 774 (1999) (holding that the Prefatory Note indicates that the intent of the UAA drafters was that "interlocutory orders, including those compelling arbitration are not appealable."). If orders related to arbitration could also be appealed via a general appeals statute, such as HRS § 641–1, then "doubts" would remain as to the appealability of all orders not explicitly identified in the RUAA.

 As discussed *supra,* however, the plain language of HRS § 658A–28, i.e. "may," indicates that the statute's list of appealable orders was not exclusive. "Departure from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given [to] the language." *Singleton v. Liquor Comm'n, Cnty. of Hawai'i,* 111 Hawai'i 234, 244, 140 P.3d 1014, 1024 (2006). The language in the Prefatory Note to the UAA was not included in either the model RUAA or Hawai'i's adoption of the RUAA. There is no indication that the legislature either considered the Prefatory Note to the UAA while adopting HRS § 658A–28 or intended it to control the interpretation of HRS § 658A–28 under the RUAA. Therefore, the Prefatory Note to the UAA does not constitute a "clear showing" that the legislature intended to depart from the plain meaning of HRS § 658A–28.

Moreover, this court's decision in *Swinerton* is not inconsistent with the Prefatory Note to the UAA, inasmuch as the Note emphasized that the purpose of the appeals provision was to "limit appeals prior to judgment as to those instances where the element of finality is present." (Emphasis added.) *Swinerton* explained that "what determines the finality of an order ... is the nature and effect of the order." 68 Haw. at 105, 705 P.2d at 33. Regarding orders compelling arbitration, *Swinerton* observed that "whether [ ] alleged contractual violations should be presented to an arbitrator ... is a matter wholly separate from the merits of plaintiff's cause." *Id.* at 106, 705 P.2d at 34 (internal quotation marks and punctuation omitted). Hence, a ruling on an motion to compel arbitration "is a <u>final</u> disposition of the claimed right." *Id.* (emphasis added). This court therefore determined that "orders ... compelling arbitration are [immediately] appealable," i.e., that under HRS § 641–1, the "nature and effect" of orders compelling arbitration demonstrated their finality. *Id.* Thus, an "element of finality is present," Prefatory Note to the UAA, in orders compelling arbitration.

### E.

Finally, Petitioners argue pursuant to HRS § 1–24, that this court should interpret HRS § 658A–28 in a manner that is uniform with the other states adopting RUAA. (Internal quotation marks and brackets omitted). First, as discussed *supra,* the majority of UAA or RUAA states to address this issue apparently recognize that the appeals provision of both model statutes are not exclusive. Hence, interpreting HRS § 658A–28 as a non-exclusive list <u>is</u> consistent with the practices of other jurisdictions. Second, other UAA or RUAA states are not uniform in disallowing appeals from orders compelling arbitration. Decisions from several UAA or RUAA states, including Nebraska, New Jersey, Oklahoma, and New Mexico permit appeals from orders compelling arbitration. Given conflicting interpretations of the UAA or RUAA appeals provision in other states, HRS § 658A–28 is not being interpreted in a non-uniform manner.

### VIII.

### A.

Regarding the second Application question, Petitioners first contend that the ICA erred in relying on *In re Kinoshita,* 287 F.2d 951, 952–53 (2d Cir.1961), because "the majority of the federal circuits have [ ] rejected *Kinoshita*'s reasoning" that the phrase "arising under" should be interpreted narrowly. In its Response, Respondent maintains that, the ICA "noted the lack of consistency by the

[federal c]ourts" on this issue, and the ICA "did not adopt the minority position" because it "expressly stated that it was not deciding that issue." (Emphasis in original.)

The language in the DSA states that "any dispute arising under the terms of the agreement" is subject to arbitration. Acknowledging the split in federal authority interpreting "arising under," the ICA stated that "[w]e need not decide that particular issue." *Unidev II*, 128 Hawai'i at 399, 289 P.3d at 1035. The ICA determined that because the provision also contained the phrase "the terms of the agreement," "the parties indicated their intent to require arbitration when a dispute implicates or involves the terms of the DSA." *Id.* (emphasis in original). The ICA opinion thus focused on the words "the terms of this agreement" and not the phrase "arising under." *Id.* Hence, the ICA did not decide whether the phrase "arising under" should be construed narrowly or broadly.

### B.

As to their second argument regarding the second question, Petitioners contend that "[c]ourts that examine nearly identical arbitration clauses [to the arbitration clause at issue in this case] refuse to characterize the controlling language as being narrow." Petitioners assert that in *Goldberg v. Focus Affiliates, Inc.*, 152 F.Supp.2d 978, 980–82 (N.D.Ill.2001), "the court held that a clause requiring arbitration for claims 'arising under the terms of this Agreement' was broad enough to encompass fraudulent inducement and negligent and fraudulent misrepresentation claims—the same claims [Respondent] asserts against [Petitioners]." (Emphasis added.) Petitioners also cite *Gregory v. Electro–Mech. Corp.*, 83 F.3d 382, 385 (11th Cir.1996), and *Campos v. Campos Family Farms, LLC*, 2012 WL 2090303 (E.D.Cal.

June 8, 2012), as supporting arbitration in this case.

According to Petitioners, in *Gregory*, the "Eleventh Circuit held that fraudulent inducement claims were within the scope of an agreement requiring arbitration of 'any dispute ... which may arise hereunder.'" Further, Petitioners contend that in *Campos*, which dealt with an agreement "requiring arbitration for 'any and all disputes over the terms and implementation of this Agreement,'" the court characterized the arbitration agreement as "broad in scope." (Emphasis added.) Consequently, Petitioners argue that the DSA's arbitration provision should be construed "broadly."

In response, Respondent reiterates that under *Cape Flattery Ltd.*, *Mediterranean Enterprises*, and *Tracer Research*, the arbitration agreement at issue in this case is "relatively narrow." Respondent also cites *Hamada v. Westcott*, 102 Hawai'i 210, 215, 74 P.3d 33, 38 (2003) as holding that an "agreement to arbitrate which contained 'arising under' language did not permit [the] arbitrator to rule on attorney['s] fees and costs." [31]

### C.

▮▮▮▮▮ Under Hawai'i law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Lee v. Heftel*, 81 Hawai'i 1, 4, 911 P.2d 721, 724 (1996). However, "the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement." *Hawai'i Med. Ass'n*, 113 Hawai'i at 92, 148 P.3d at 1194 (citation omitted). "What issues, if any, are beyond the scope of a contractual agreement to arbitrate depends on the wording of the contractual agreement to arbitrate." *Id.* (ci-

---

**31.** In *Hamada*, 102 Hawai'i at 215, 74 P.3d at 38, this court held that an "agreement to arbitrate which contained 'arising under' language did not permit [an] arbitrator to rule on attorney['s] fees and costs." *Hamada* excluded the issue of attorney's fees and costs from the scope of an arbitration agreement because in another contractual provision related to early termination, the parties explicitly stated that the terminating party would be liable for the payment of attorney's fees. *Hamada*, 102 Hawai'i at 212, 74

P.3d at 35. This court therefore concluded that attorney's fees were not within the scope of the arbitration agreement because "[w]here the parties intended to provide for attorney's fees and costs in the purchase agreement, they said so." *Id.* at 215, 74 P.3d at 38. *Hamada* is not applicable to the instant case, where no provisions in the DSA beyond the arbitration agreement itself are relevant to the breadth of the arbitration agreement.

tations omitted) (emphasis in original). An arbitration agreement is interpreted like a contract, and "as with any contract, the parties intentions control." *Heftel*, 81 Hawai'i at 4, 911 P.2d at 724. Further, "we have long expressed our disapproval of interpreting a contract such that any provision be rendered meaningless." *Stanford Carr Dev. Corp. v. Unity House*, 111 Hawai'i 286, 297, 141 P.3d 459, 470 (2006).

Those courts deciding that the phrase "arising under" should be interpreted narrowly emphasize that the choice to use "arising under" instead of language such as "arising out of or in relation to" must be meaningful. *See Mediterranean Enterprises*, 708 F.2d at 1464. For example, in construing the phrase "arising under" as narrow, the Ninth Circuit stated that "[t]he standard phrase suggested in the U.S.-Korean Commercial Arbitration Agreement contains the phrase "out of or in relation to or in connection with the contract, or for the breach thereof." *Id.* Because the agreement before that court excluded much of that language, and referred only to "any disputes arising hereunder," the court reasoned that "[w]e have no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of disputes, i.e., only those relating to interpretation and performance of the contract." *Id.; see also Kinoshita*, 287 F.2d at 953 (holding that the parties choice to require arbitration for disputes which "arise under" a contract, when the standard language was "arising out of or relating to" demonstrated that the parties intended the agreement to be narrow).

In contrast, the majority of federal courts conclude that the policy favoring arbitration requires arbitration provisions containing "general language," such as the language at issue in the instant case, be construed broadly. *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l., Ltd.*, 1 F.3d 639, 642–43 (7th Cir.1993). In *Sweet Dreams Unlimited*, the arbitration clause at issue provided that "any disputes arising out of the agreement" shall be settled through arbitration. The Seventh Circuit ruled that "arising out of" and "arising under" both constituted "general language" authorizing arbitration. There-

fore, should parties wish to exempt specific issues from arbitration, they should use "specific language to identify the types of disputes that are not subject to arbitration, thereby limiting the reach of phrases such as 'arising out of' or 'arising under.'" *Id.* at 643 (emphasis in original). Because the parties in *Sweet Dreams Unlimited* had "not taken any steps to narrow the reach of the [ ] arbitration clause," the Seventh Circuit interpreted the clause's scope broadly, and held that it covered allegations that the contract was void due to illegality and allegations of fraud or misrepresentation that occurred "after the agreement expired." *Id.*

Several other courts have also interpreted arbitration provisions containing "arising under" language as "general" arbitration clauses whose scope is broad. For example, in *PRM Energy Systems*, the arbitration clause at issue "cover[ed] 'all disputes arising under' the agreement." 592 F.3d at 836. The Eighth Circuit explained that this arbitration clause "includes no limiting language and is generally broad in scope." *Id.* at 837. It was concluded the "arising under" arbitration clause thus applied to tort claims including fraud, misappropriation of trade secrets, unfair competition, and tortious interference. *Id.* at 832, 837; *cf. Heftel*, 81 Hawai'i at 2, 4, 911 P.2d at 722, 724 (concluding that an arbitration clause covering "any dispute ... [that] arises out of this [contract]" was a "broad arbitration clause").

■ Under the circumstances of this case, the reasoning of the federal courts in construing similar arbitration clauses broadly is persuasive. Respectfully, the ICA's interpretation of the arbitration provision's scope, i.e., that the clause only mandates arbitration for claims that involve "construction or interpretation of the DSA's terms," appears unnecessarily narrow. We conclude that the arbitration clause in the instant case constitutes a "general" arbitration clause. As discussed *infra*, this application of the arbitration clause in the DSA covers the claims and counterclaims raised by the parties in the instant case.

Moreover, as in *Sweet Dreams Unlimited* and *PRM Energy*, the general arbitration clause contained "no limiting language" that

396

could have narrowed its scope. *PRM Energy*, 592 F.3d at 837. "[W]e [ ] look to the language of the arbitration clause to determine whether [an] underlying dispute ... is arbitrable." *Koolau Radiology, Inc. v. Queen's Medical Center*, 73 Haw. 433, 447, 834 P.2d 1294, 1301 (1992); *see also Rainbow Chevrolet, Inc. v. Asahi Jyuken (USA), Inc.*, 78 Hawai'i 107, 113, 890 P.2d 694, 700 (App. 1995), *superseded by statute as stated in, Ueoka v. Szymanski*, 107 Hawai'i 386, 114 P.3d 892 (2005) ("What issues, if any, are beyond the scope of a contractual agreement to arbitrate depends on the wording of the contractual agreement to arbitrate."). In this case, the arbitration clause employed general language. Thus, it may be inferred from the clause that the parties did not intend to restrict the reach of the arbitration clause simply to claims involving construction or arbitration of the terms of the agreement. Had the parties intended to restrict arbitration to issues related to interpretation of the DSA's terms only, as the ICA suggests, it would have been a simple matter to draft unambiguous language to effectuate that intent. For example, the parties could have provided that arbitration was limited to disputes regarding construction or interpretation of the DSA. The failure of the parties to unambiguously limit the arbitrability of disputes suggests that they intended a longer reach for the arbitration clauses. *Sweet Dreams Unlimited*, 1 F.3d at 643. Thus, respectfully, the ICA erred in concluding that the scope of the arbitration agreement was limited to "claims that involve construction or interpretation of the DSA's terms." *Unidev II*, 128 Hawai'i at 399, 289 P.3d at 1035.

## IX.

### A.

■ As to the third question raised in the Application, Petitioners argue that all of Respondent's claims and Petitioners' counterclaims are subject to arbitration. Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint. *See Heftel*, 81 Hawai'i at 4, 911 P.2d at 724 (examining the plaintiff's "general allegations" to determine if a claim

was arbitrable). There are five factual bases alleged for Respondent's claims of false claims, unfair and deceptive practices, fraudulent inducement, intentional misrepresentation, and negligent misrepresentation. They are that (1) Petitioners submitted invoices that demanded payment for services for which Petitioner had already received payment, (2) Petitioners submitted invoices which misrepresented that funds would be used to pay contractors, (3) Petitioners submitted invoices that Respondent was not required to pay, (4) Petitioners made misrepresentations to induce Respondent to provide funding to the Project, and (5) Petitioners made misrepresentations to induce Respondent to award the Project to Petitioners.

As to (1), (2), and (3), the invoices that Respondent objects to all requested payment for work allegedly performed on behalf of the project. Thus, the invoices that Respondent alleges are fraudulent are covered by the general language referring to disputes arising under the DSA inasmuch as the payments involved Petitioners' obligation to develop the Project for Respondent.

Similarly, as to (4), Respondents allege that the purpose of Petitioners' misrepresentations was to obtain further funding for the Project. Because the contractual relationship created by the DSA between Petitioners and Respondent initiated the development of the Project, these allegations also arose under the DSA.

■ As to (5), Petitioner claims that the contract itself was fraudulently induced. In *Heftel*, this court concluded that "a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." 81 Hawai'i at 4, 911 P.2d at 724. However, this court limited its holding to cases "where no claim is made that fraud was directed to the arbitration clause itself." *Heftel*, 81 Hawai'i at 4, 911 P.2d at 724. In the instant case, as in *Heftel*, Respondent's "general allegations were based on fraud in the inducement of the contract as a whole, rather than fraud in the inducement of the arbitration clause." *Id.* Hence, the factual allegations that Petitioners' made misrepresentations to induce Re-

spondent to award them the Project also fall within the scope of the arbitration agreement.

Finally, for its negligence claim in its first complaint, Respondent alleged that Petitioners failed to abide by the terms of the DSA, which required Petitioners to obtain prior approval for certain consultant contracts and their expenses. In other words, Respondent alleges that Petitioners did not meet the contractual obligations set forth in the DSA. Thus, as the ICA recognized, this allegation arose under the DSA.

As to Petitioners' counterclaims, Petitioners allege that (1) WWH breached the DSA and ADSA, (2) Respondent and WWH were unjustly enriched because they did not pay Petitioners for the benefits of their services, (3) Respondent interfered with the contract between WWH and Petitioners, and (4) WWH fraudulently transferred land to Respondent to avoid paying Petitioners what they were owed under the ADSA. All four claims relate to the relationship between WWH and Petitioners. The DSA foresaw that Respondent would transfer the Property to WWH, and that WWH would work with Petitioners to complete the Project. As the court recognized, then, Petitioners' counterclaims "arise out of the relationship between the parties" created by the DSA.

## X.

Thus, Respondent's claims and Petitioners' counterclaims fall within the scope of the DSA arbitration provision, and are subject to arbitration. To the extent that the ICA held otherwise, respectfully, the ICA erred. Based on the foregoing, the ICA's October 17, 2011, Order Denying September 19, 2011 Motion to Dismiss Appeal for Lack of Jurisdiction is affirmed. In light of the reasons stated herein, the ICA's August 31, 2012 opinion and October 18, 2012 judgment on appeal are vacated in part and affirmed in part. The case is remanded to the court for further proceedings consistent with this opinion.