**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000352
19-AUG-2015
09:49 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

WILLIAM ERIC BOYD,
Appellant/Appellee/Cross-Appellant,
v.
HAWAII STATE ETHICS COMMISSION, STATE OF HAWAI'I,
Appellee/Appellant/Cross-Appellee

NO. CAAP-14-0000352

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 13-1-115)

AUGUST 19, 2015

NAKAMURA, C.J., FOLEY AND REIFURTH, JJ.

OPINION OF THE COURT BY FOLEY, J.

Appellee/Appellant/Cross-Appellee Hawaii State Ethics Commission (**Commission**) and Appellant/Appellee/Cross-Appellant William Eric Boyd (**Boyd**) both appeal from the "Decision and Order Affirming In Part And Reversing In Part Hawaii State Ethics Commission's Findings of Fact, Conclusions of Law And Decision And Order" (**Order**) entered October 7, 2013 in the Circuit Court of the Third Circuit[1] (**circuit court**).

This is a secondary appeal from the circuit court's review of the Commission's "Findings Of Fact, Conclusions Of Law,

---

[1] The Honorable Judge Greg K. Nakamura presided.

And Decision And Order" (**FOF/COL**), entered February 8, 2013, that found Boyd guilty of violating the Hawaii Revised Statutes (**HRS**) chapter 84's Code of Ethics (**Code of Ethics**) violations. On appeal, the Commission contends the circuit court erred in reversing in part its FOF/COL, holding that Boyd was guilty of violating HRS § 84-14(d) (2012 Repl.) (Counts 10-20). On cross-appeal, Boyd contends the circuit court erred in affirming in part the Commission's FOF/COL because (1) the Commission lacked appellate jurisdiction to bring charges against Boyd because Boyd was not a State employee; (2) the State violated its own procedural rules so as to violate Boyd's constitutional due process protections; (3) the Commission was not a fair and impartial tribunal so as to violate Boyd's constitutional due process protections; (4) the Commission failed to prove that Boyd violated HRS § 84-14(a) (Counts 1-9); and (5) the Commission's overall actions were arbitrary, capricious, and an abuse of discretion.

## I. BACKGROUND

### A. Purchase of School Materials

Boyd was an Administrative Assistant at Connections New Century Public Charter School (**Connections**), a public charter school created pursuant to HRS chapter 302B. As an employee of Connections, Boyd was authorized to submit purchase order forms requesting that Connections purchase school materials.

Connections utilized a purchase procedure to obtain supplies, material, and equipment for the school, which included use of a form the school developed for purchase requests (**purchase order form**). The purchase order form identified (a) the name and title of the individual making the request (**requestor**); (b) the name, address, and telephone number of the individual or entity from whom the materials could be purchased (**vendor**); (c) the school materials desired, including the quantity and pricing; and (d) the name of the individual approving the request. The requestor would enter the vendor's name, address, and telephone number on the purchase order form, then submit the purchase order form to an authorized Connections official for approval. Connection's Principal, John Thatcher

2

(**Principal Thatcher**), had the final authority for approval of all purchase requests. If Principal Thatcher was unavailable, Boyd was authorized to preliminarily approve purchase orders, but all of Boyd's approvals were subject to final approval by Principal Thatcher, as indicated by Principal Thatcher's initials or signature on the purchase order form. The approval process also requires someone check the school's inventory to make sure the school did not have the requested material, check with vendors to find the best prices for the requested materials, and have the "Title 1 Coordinator" review and approve the order, if the purchase involved the use of Title 1 funds.[2]

On September 12, 2006, February 9, 2007, April 2, 2007, May 8, 2007, and June 29, 2007, Boyd prepared, signed as "Requestor," and/or approved various Connections purchase order forms to purchase school materials for the school.

On certain of the aforementioned purchase order forms, Boyd wrote his wife's name, Erika Boyd (**Erika**), as the requestor and also identified Erika as the vendor by writing her name on the line captioned "Payable to:". On two of the purchase order forms, Principal Thatcher approved of the purchase order by signing on the line captioned "Approved." On all other forms, Boyd approved the purchase order and Principal Thatcher subsequently initialed the purchase order form to indicate his final approval. The school materials referenced on all purchase order forms were sold to Connections through Erika and were fulfilled by an Amway distributorship business that Boyd and Erika co-owned (**Amway business**).

**B.  Lunch Service Program**

In 2007, Connections contracted with "Boyd Enterprises" to provide school lunches to Connections' high school students. Boyd Enterprises was co-owned by Boyd and his wife, Erika, and also did business as "Tropical Dreams," "Tropical Dreams Ice Cream," and "Just Fabuloso."

---

[2]      "Title 1 funds" are federal monies provided to schools with a high level of poverty, and such funds may be used to supplement the school's instructional program.

As part of the procedure for obtaining payment for the school lunches Boyd Enterprise provided, Boyd Enterprises submitted invoices, titled a "Food Service Certificates," (**Food Service Certificate**) to Connections that reflected the number of school lunches provided to the school and the total cost owed to Boyd Enterprises. Boyd Enterprises was required to submit to Connections a duly signed and certified Food Service Certificate before Connections could pay Boyd Enterprises for lunches provided to the school. Principal Thatcher had the authority to approve payments to Boyd Enterprises for Food Service Certificates. In the absence of Principal Thatcher, Sandra Kelley (**Kelley**), a school official at Connections, had the authority to approve payment of the Food Service Certificates.

Boyd Enterprises, doing business as Tropical Dreams Ice Cream, submitted several Food Service Certificates to Connections reflecting that Boyd Enterprises provided a varying number of school lunches to the school. Boyd signed the Food Service Certificates on behalf of Boyd Enterprises as its "Food Service Manager," certifying that the lunches had been provided. Kelley signed the Food Service Certificates on the line captioned "School Official" on behalf of Connections. "Please make check payable to Erika Boyd" was on all but one of the Food Service Certificates.

On the following dates, Boyd, as a representative of Boyd Enterprises, submitted the Food Service Certificates to Connections:

(1) January 25, 2007; Paid January 25, 2007;

(2) February 1, 2007; Paid February 5, 2007;

(3) February 9, 2007; Paid February 9, 2007;

(4) February 16, 2007; Paid February 20, 2007;

(5) March 1, 2007; Paid March 2, 2007;

(6) March 9, 2007; Paid March 9, 2007;

(7) April 5, 2007; Paid April 5, 2007;

(8) April 19, 2007; Paid April 19, 2007;

(9) May 10, 2007; Paid May 10, 2007;

(10) May 31, 2007; Paid May 31, 2007; and

(11) June 21, 2007; Paid June 22, 2007.

4

Connections paid Erika for the lunches Boyd Enterprises provided.

## C.  Procedural History

In a Charge dated October 20, 2010, the Commission formally charged Boyd with violating HRS § 84-14(a) and (d) of the Code of Ethics.  On November 22, 2010, Boyd filed an Answer to the Commission's Charge.

On April 18, 2012, the Commission issued its "Further Statement of Alleged Violation" in furtherance of its original October 20, 2010 Charge against Boyd.  The Commission's Further Statement of Alleged Violation charged Boyd with nine counts of HRS § 84-14(a) violations, for requesting and approving the purchase of school materials from Boyd's Amway business, and eleven counts of HRS § 84-14(d) violations, for assisting Boyd Enterprises in transactions to provide lunches to Connections for compensation.  The Commission's Further Statement of Alleged Violation charged the following:

> B.  COUNTS ONE THROUGH NINE
> Violations of HRS section 84-14(a)
>
> 19. The Hawaii State Ethics Commission realleges paragraphs 1-18 of this Further Statement of Alleged Violation.
>
> 20. On or about September 12, 2006, [Boyd], as a school employee, ordered $264.45 worth of school materials for Connections from his Amway business, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84-14(a). (Count 1)
>
> 21. On or about February 9, 2007, [Boyd], as a school employee, ordered $778.61 worth of school materials for Connections from his Amway business, including a mini-DV camcorder kit, a fax/copier, and ink, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84-14(a). (Count 2)
>
> 22. On or about February 9, 2007, [Boyd], as a school employee, approved the purchase of school materials from his Amway business and payment by Connections to his Amway business in the amount of $778.61, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84-14(a). (Count 3)
>
> 23. On or about February 9, 2007, [Boyd], as a school employee, ordered $2,495.97 worth of digital camcorders for Connections from his Amway business, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84-14(a). (Count 4)
>
> 24. On or about April 2, 2007, [Boyd], as a school employee, ordered $142.47 worth of school materials for Connections from his Amway business, and thereby took official action directly affecting his Amway business, in violation of HRS section 84-1[§] (Count 5)

5

25. On or about April 2, 2007, [Boyd], as a school employee, approved the purchase of school materials from his Amway business and payment by Connections to his Amway business in the amount of $142.47, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84—14 (a). (Count 6)

26. On or about May 8, 2007, [Boyd], as a school employee, approved the purchase of school materials from his Amway business and payment by Connections to his Amway business in the amount of $956.73, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84—14(a). (Count 7)

27. On or about June 29, 2007, [Boyd], as a school employee, approved the purchase of school materials from his Amway business and payment by Connections to his Amway business in the amount of $503.14, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84-14 (a). (Count 8)

28. On or about June 29, 2007, [Boyd], as a school employee, approved the purchase of school materials from his Amway business and payment by Connections to his Amway business in the amount of $781.90, and thereby took official action directly affecting his Amway business, in violation of HRS [§] 84—14 (a). (Count 9)

. . . .

### B. COUNTS TEN THROUGH TWENTY
Violations of HRS section 84—14(d)

38. The Hawaii State Ethics Commission realleges paragraphs 1-37 of this Further Statement of Alleged Violation.

39. on or about January 25, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $453.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84—14 (d). (Count 10)

40. On or about February 1, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $450.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84—14(d). (Count 11)

41. On or about February 9, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $468.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84—14(d). (Count 12)

42. On or about February 16, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $468.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of FIRS [§] 84—14(d). (Count 13)

43. On or about March 1, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for

payment of $432.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14(d). (Count 14)

44. On or about March 9, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $447.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14 (d). (Count 15)

45. On or about April 5, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for paymen t of $456.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14(d). (Count 16)

46. On or about April 19, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $909.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14 (d). (Count 17)

47. on or about May 10, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $306.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14(d). (Count 18)

48. On or about May 31, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $975.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in, a transaction with Connections, in violation of HRS [§] 84-14 (d). (Count 19)

49. On or about June 21, 2007, [Boyd], on behalf of Boyd Enterprises, submitted to Connections an invoice for payment of $165.00 for school lunches, and thereby assisted or represented Boyd Enterprises for pay or other compensation in a transaction with Connections, in violation of HRS [§] 84-14 (d). (Count 20)

On May 10, 2012, Boyd filed an Answer to the Commission's Further Statement of Alleged Violation, a Request for Formal and Contested Hearing, and a Request for Open Hearing. On July 5, 2012, the Commission issued a Notice of Hearing, granting Boyd's request for a contested case hearing.

On November 27 and November 28, 2012, the Commission held hearings on the charges against Boyd. The Commission called Kelley and Boyd to testify. Boyd testified on his own behalf and called Principal Thatcher as a witness.

On February 8, 2013, the Commission filed its FOF/COL, concluding that Boyd had "committed nine (9) violations of HRS

7

§ 84-14(a) (Counts 1 through 9) and eleven (11) violations of HRS § 84-14(d) (Counts 10 through 20)." The Commission fined Boyd $500 for each violation committed, resulting in a total administrative fine of $10,000.

On February 15, 2013, Boyd filed a "Notice of Appeal to Circuit Court," appealing the Commission's FOF/COL. On May 13, 2013, Boyd filed his opening brief and argued that the Commission (1) violated his due process rights by violating the Commission's own procedural rules; (2) violated his due process rights to a fair and impartial tribunal; (3) lacked statutory jurisdiction over Boyd because Boyd was not a State employee; (4) failed to prove that Boyd intended to violate the Code of Ethics; (5) failed to prove that Boyd violated HRS § 84-14(a) (Counts 1-9); (6) failed to prove that Boyd violated HRS § 84-14(d) (Counts 10-20); and (7) acted "arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion[.]" The Commission filed its answering brief on June 25, 2013.

On October 7, 2013, the circuit court filed its Order, affirming in apart and reversing in part the Commission's FOF/COL. The circuit court held that Boyd's due process rights were not violated during his hearing, that the Commission was a fair and impartial tribunal, and that the Commission did not abuse it discretion in regards to pre-hearing and hearing matters. The circuit court's Order also affirmed the Commission's determination that Boyd was a State Employee and that Boyd had violated HRS § 84-14(a)(1) (Counts 1-9). The circuit court, however, reversed the Commission's determination that Boyd had violated HRS § 84-14(d) (Counts 10-20) and held that the Commission failed to find that Boyd "received money in return for, or in exchange for, the act of signing the Food Service Certificates[,]" so to constitute "compensation" as defined under HRS § 84-3 (2012 Repl.). The circuit court entered its Final Judgment on December 16, 2013.

On January 14, 2014, the Commission filed a Notice of Appeal. On January 16, 2014, Boyd filed a Notice of Cross-Appeal.

## II.  STANDARD OF REVIEW

"On secondary judicial review of an administrative decision, Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court." Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988).  For administrative appeals, the applicable standard of review is set forth in HRS § 91-14(g) (2004), which provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

> (1)  In violation of constitutional or statutory provisions; or

> (2)  In excess of the statutory authority or jurisdiction of the agency; or

> (3)  Made upon unlawful procedure; or

> (4)  Affected by other error of law; or

> (5)  Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

> (6)  Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to HRS § 91-14(g)(5),

> administrative findings of fact are reviewed under the clearly erroneous standard, which requires [the appellate] court to sustain its findings unless the court is left with a firm and definite conviction that a mistake has been made. Administrative conclusions of law, however, are reviewed under the de novo standard inasmuch as they are not binding on an appellate court. Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency.  To be granted deference, however, the agency's decision must be consistent with the legislative purpose.

> Peroutka v. Cronin, 117 Hawaiʻi 323, 326, 179 P.3d 1050, 1053 (2008) (citations and internal quotation marks omitted).

AlohaCare v. Ito, 126 Hawaiʻi 326, 341, 271 P.3d 621, 636 (2012).

### III.  DISCUSSION

**A.   The Commission had jurisdiction to bring charges against Boyd.**

The Commission charged Boyd with violating several sections of the Code of Ethics, HRS § 84-14(a)[3] and HRS § 84-14(d)[4], in his capacity as Administrative Assistant at Connections.  Boyd contends the Commission did not have jurisdiction to prosecute him because he was not an "employee" of the State and, thus, HRS chapter 84 did not apply to him.

The purpose of HRS chapter 84, as put forth in the preamble of the chapter, is three-fold:

(1) prescribe a code of ethics for elected officers and public employees of the State as mandated by the people of the State of Hawaii in the Hawaii constitution, article XIV;

(2) educate the citizenry with respect to ethics in government; and

(3) establish an ethics commission which will administer the codes of ethics adopted by the constitutional convention and by the legislature and render advisory opinions and enforce the provisions of this law so that public confidence in public servants will be preserved.

(Format altered.)

The Code of Ethics applies "to every nominated, appointed, or elected officer, employee, and candidate to elected

---

[3]     HRS § 84-14(a) provides in relevant part:

**§ 84-14 Conflict of interest.** (a) No employee shall take any official action directly affecting:

(1)   A business or other undertaking in which the employee has a substantial financial interest; or

(2)   A private undertaking in which the employee is engaged as legal counsel, advisor, consultant, representative, or other agency capacity.

[4]     HRS § 84-14(d) provides:

(d) No legislator or employee shall assist any person or business or act in a representative capacity for a fee or other compensation to secure passage of a bill or to obtain a contract, claim, or other transaction or proposal in which the legislator or employee has participated or will participate as a legislator or employee, nor shall the legislator or employee assist any person or business or act in a representative capacity for a fee or other compensation on such bill, contract, claim, or other transaction or proposal before the legislature or agency of which the legislator or employee is an employee or legislator.

office of the State and for election to the constitutional convention, but excluding justices and judges[.]" HRS § 84-2 (2012 Repl.). "Employee" is defined as "any nominated, appointed, or elected officer or employee of the State, including members of boards, commissions, and committees, and employees under contract to the State or of the constitutional convention, but excluding legislators, delegates to the constitutional convention, justices and judges." HRS § 84-3. HRS § 84-1 instructs that "[chapter 84] shall be liberally construed to promote high standard of ethical conduct in state government[,]" but does not specifically indicate whether charter school employees are "employees of the State" so as to be required to adhere to the Code of Ethics.

## 1. Boyd is a State Employee.

Boyd appears to make two conflicting arguments as to why he was not required to abide by the Code of Ethics. First, Boyd contends that at the time that his alleged violations occurred he was an employee of Connection's Local School Board (**LSB**), not the State of Hawai'i. During the hearing before the Commission, Principal Thatcher also testified that Boyd "can be fired by the local school board[,]" "was hired by the local school board[,]" and was "under the jurisdiction of the local school board."

At the time Boyd allegedly violated the Code of Ethics, charters schools were governed under HRS chapter 302B. "When the State legislature enacted HRS [c]hapter 302B, the Public Charter School chapter, the legislature described the charter school system as an 'important complement to the [DOE's] school system, one that empowers local school boards and their charter schools by allowing more autonomy and flexibility and placing greater responsibility at the school level." Waters of Life Local School Bd. v. Charter School Review Panel, 126 Hawai'i 183, 187, 268 P.3d 436, 440 (2011) (quoting 2006 Haw. Sess. Laws Act 298, § 1 at 1200) (emphasis omitted). The legislature described the charter school system as being made up of the Board of Education, the Charter School Administrative Office, the Charter School Review Panel, and the individual charter schools. See id.

11

(citing 2006 Haw. Sess. Laws Act 298, § 1 at 1200-01). In addition, the charter school system also includes the LSB, which is the governing body of the charter school, and the charter school itself. Id. at 188, 268 P.3d at 441. This court specifically held that "[a]s part of a State entity administratively attached to DOE, the LSB is considered an arm of the State." Id. at 189, 268 P.3d at 442. Boyd's argument that he is an employee of Connection's LSB, not the State of Hawaiʻi, is therefore a distinction without a difference. Given that the LSB is an "arm of the State" and Boyd admits that he was employed by the LSB, Boyd was an employee of the State so as to be subject to the Code of Ethics.

In addition, several other statutory provisions specifically treat employees of charter schools as State employees. See HRS § 302B-10(b) (2007 Repl.) ("The State shall afford administrative, support, and instructional employees in charter schools full participation in the State's system for retirement, workers' compensation, unemployment insurance, temporary disability insurance, and health benefits in accordance with the qualification requirements for each."); HRS § 302B-11 (2007 Repl.) ("The department of human resources development shall administer workers' compensation claims for employees of charter schools, who shall be covered by the same self-insured workers' compensation system as other public employees."); HRS § 302B-9(d) (2007 Repl.) ("[A]s public schools and entities of the State, neither a charter school nor the office may bring suit against any other entity or agency of the State."); HRS § 89-10.55(a) (2012 Repl.) ("Employees of charter schools shall be assigned to an appropriate bargaining unit as specified in section 89-6[.]").

A review of the record indicates that Boyd participated in many of the available benefits of being a State employee. He was enrolled in the State's Employee's Retirement System (**ERS**), the State's Employer-Union Trust Fund (**EUTF**), and was a member of a State bargaining unit. Boyd needed to be classified as a State employee in order to receive those benefits. The term "employee" for purposes of HRS chapter 88 (Pension and Retirement Systems)

refers to "any employee or officer or the State or any county[.]" HRS § 88-21 (2012 Repl.). HRS § 88-42 (2012 Repl.) indicates that "all persons who . . . enter or reenter the service of the State or any county shall become members [of ERS] at the time of their entry or reentry." The record indicates that Boyd self-identified as a State employee in order to qualify for ERS. On April 9, 2003, Boyd filed an ERS "Membership Enrollment Form" as a "Returning Member," meaning that he previously "terminated or resigned and after a break in service of at least 1 working day, [he was] now back in service." (Emphasis in original.) On the ERS form, he checked "Yes" next to the question "Are you currently employed by another State/County agency?" and indicated the "DOE - Education" as the department with which he was employed.

Boyd again self-identified as a State employee in April 27, 2005 in order to enroll in the State's EUTF program and obtain health insurance through his employment with the State. Under HRS § 87A-31 (2012 Repl.), the EUTF "shall be used to provide employee-beneficiaries and dependent-beneficiaries with health and other benefit plans[.]" "Employee-beneficiary" includes

> "Employee-beneficiary" means:
>
> (1)   An employee;
>
> (2)   The beneficiary of an employee who is killed in the performance of the employee's duty;
>
> (3)   An employee who retired prior to 1961;
>
> (4)   The beneficiary of a retired member of the employees' retirement system; a county pension system; or a police, firefighters, or bandsmen pension system of the State or a county, upon the death of the retired member;
>
> (5)   The surviving child of a deceased retired employee, if the child is unmarried and under the age of nineteen; or
>
> (6)   The surviving spouse of a deceased retired employee, if the surviving spouse does not subsequently remarry;
>
> provided that the employee, the employee's beneficiary, or the beneficiary of the deceased retired employee is deemed eligible by the board to participate in a health benefits plan or long-term care benefits plan under this chapter.

HRS § 87A-1 (2012 Repl.) (emphasis added). "Employee" is defined as an "employee or officer of the State, county, or legislature" and does not exempt Charter Schools.

On a EUTF "Enrollment Form for Active Employees," signed and dated April 27, 2005, Boyd wrote his name under the section for "Employee's Last Name, First, M.I." Under a section that was for "State Employees ONLY (Premium Conversion Plan)," Boyd checked the box "Enroll," thus indicating that he self-identified as a State employee. Boyd also checked the box that indicated he was a "State or County - Employee or Retiree."

In addition, the bottom of Boyd's EUTF enrollment form and a subsequent EUTF Confirmation Notice indicates that he was part of Bargaining Unit 03 in 2005 and remained in Bargaining Unit 03 in 2009. Under HRS § 89-10.55(a) and (b), "[e]mployees of charter schools shall be assigned to an appropriate bargaining unit as specified in section 89-6 [(2012 Repl.)]" and "[f]or the purpose of negotiating a collective bargaining agreement for charter schools employees who are assigned to an appropriate bargaining unit, the employer shall be determined as provided in section 89-6(d)."

HRS § 89-6(d) (2007 Supp.) provides:

> (d) For the purpose of negotiating a collective bargaining agreement, the public employer of an appropriate bargaining unit shall mean the governor together with the following employers:
>
> (1) For bargaining units (1), (2), (3), (4), (9), (10), (13), the governor shall have six votes and the mayors, the chief justice, and the Hawaii health systems corporation board shall each have one vote if they have employees in the particular bargaining unit[.]

(Emphasis added.) Therefore, Boyd's enrollment in an collective bargaining unit establishes that, for bargaining purposes, the governor is considered his "public employer" and that Boyd is treated as a State employee.[5]

---

[5]    Boyd cites to HRS § 89-6(c) in support of his argument that the LSB is his employer, not the State of Hawai'i. HRS § 89-6(c) provides:

**§ 89-10.55. Charter school collective bargaining; bargaining unit; employer; exclusive representative.**

. . . .

(continued...)

Given that the LSB is a State entity, that statutory provisions governing charter schools treat charter school employees as State employees, and that Boyd self-identified as a State employee in order to obtain State benefits, we hold that Boyd was an employee of the State and was required to adhere to the Code of Ethics.

### 2. Charter school employees are not exempt from the Code of Ethics requirements.

The second argument Boyd proffers in support of his appeal is that charter schools are specifically exempt from the Code of Ethics requirement. In support of Boyd's argument that he was not required to adhere to the Code of Ethics, Boyd cites to HRS chapter 302B (repealed effective June 19, 2012). Specifically, Boyd cites to the a 2011 amendment of HRS § 302B-7(f) that states that "Charter schools and their local school boards shall develop internal policies and procedures consistent with ethical standards of conduct, pursuant to chapter 84." HRS § 302B-7(f) (Supp. 2011). Boyd's reliance on the 2011 amended version of HRS § 302B-7(f) is misplaced because sub-section (f), dealing with charter school's ethical standards, was not placed into law until 2011, nearly four years after Boyd's alleged violations. 2011 Haw. Sess. Laws Act 130, § 5 at 341-42. Thus, the amended version of HRS § 302B-7(f), requiring that charter schools create their own internal ethical standards of conduct, was not in effect during the time the Commission contends Boyd violated Chapter 84 and is not applicable to this case on appeal. See HRS §§ 1-3 (2009 Repl.); Clark v. Cassidy, 64 Haw. 74, 77, 636 P.2d 1344, 1346 (1981) ("It is an established rule that no

---

[5](...continued)
> (c) For the purpose of negotiating a memorandum of agreement or a supplemental agreement that only applies to employees of a charter school, the employer shall mean the governing board, subject to the conditions and requirements contained in the applicable sections of this chapter governing any memorandum of agreement or supplemental agreement.

As previously noted, the LSB remains an "arm of the State." Therefore, HRS § 89-10.55(c) in no way conflicts with our holding that Boyd is a State employee. (Emphasis added.)

law has any retrospective operation, unless otherwise expressed or obviously intended." (Parenthesis omitted)).

At the time of Boyd's alleged ethics violations, HRS chapter 302B made no mention of Chapter 84, but did exempt charter schools from portions of several other statutes, including HRS chapters 76, 89, 91, 92, and 103D, but not HRS Chapter 84. HRS §§ 302B-7(d), -8(a), -9(a) (2007 Repl.). Boyd contends that by exempting charter schools from these statutory provisions, the legislature also intended to exempt charter schools from the Code of Ethics. Boyd's contention is not supported by canons of statutory construction.

"It is well settled that a court's primary obligation in interpreting a statute is to give effect to the intent of the legislature." Int'l Sav. & Loan Ass'n, Ltd. v. Wiig, 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996). "Under the canon of expressio unius est exclusio alterius, 'the mention of one thing implies the exclusion of another.'" Cnty. of Hawaii v. UNIDEV, LLC, 129 Hawai'i 378, 389, 301 P.3d 588, 599 (2013) (quoting Int'l Sav. and Loan Ass'n, 82 Hawai'i at 201, 921 P.2d at 121). "However, this canon applies 'only where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute.'" UNIDEV, 129 Hawai'i at 389, 301 P.3d at 599.

HRS § 302B-7 exempted charters schools from parts of Chapters 91 ("Administrative Procedure"), 92 ("Public Agency Meetings and Records"),[6] and 103D ("Hawaii Public Procurement Code").[7] The exemptions found under HRS § 302B-7 were again

_____

[6] Under HRS § 302B-7(e), "Charter schools and their local school boards shall be exempt from the requirements of chapters 91 and 92."

[7] HRS § 302B-7(d) provides:

> (d) Local school boards shall be exempt from chapter 103D, but shall develop internal policies and procedures for the procurement of goods, services, and construction, consistent with the goals of public accountability and public procurement practices. Charter schools are encouraged to use the provisions of chapter 103D wherever

(continued...)

reiterated under HRS § 302B-9, which was entitled "Exemptions from state laws."[8]  Here, the contrast between the exempted

---

[7](...continued)
possible; provided that the use of one or more provisions of chapter 103D shall not constitute a waiver of the exemption from chapter 103D and shall not subject the charter school to any other provision of chapter 103D.

[8]     HRS § 302B-9 provides:

§ 302B-9 Exemptions from state laws.  (a) Charter schools shall be exempt from chapters 91 and 92 and all other state laws in conflict with this chapter, except those regarding:
(1)     Collective bargaining under chapter 89; provided that:

(A)     The exclusive representatives as defined in chapter 89 and the local school board of the charter school may enter into supplemental agreements that contain cost and noncost items to facilitate decentralized decision-making;
(B)     The agreements shall be funded from the current allocation or other sources of revenue received by the charter school; provided that collective bargaining increases for employees shall be allocated by the department of budget and finance to the charter school administrative office for distribution to charter schools; and

(C)     These supplemental agreements may differ from the master contracts negotiated with the department;

(2)     Discriminatory practices under section 378-2; and

(3)     Health and safety requirements.

(b) Charter schools and the office shall be exempt from chapter 103D, but shall develop internal policies and procedures from the procurement of goods, services, and construction, consistent with the goals of public accountability and public procurement practices. Charter schools and the office are encouraged to use the provisions of chapter 103D where possible; provided that the use of one or more provisions of chapter 103D shall not constitute a waiver of the exemption from chapter 103D and shall not subject the charter school or the office to any other provision of chapter 103D.  Charter schools and the office shall account for funds expended for the procurements of goods and services, and this accounting shall be available to the public.

(c) Any charter school, prior to the beginning of the school year, may enter into an annual contract with any department for centralized services to be provided by that department.

(d) Notwithstanding any law to the contrary, as
(continued...)

procedural statutes and the Code of Ethics leads to an inference that the latter was not intended to be included within the list of exempted statutes. Thus, Boyd's argument that it can be implied that the legislature intended charter schools to be exempt from the Code of Ethics requirements is without merit.

**B.    The Commission did not violate its own procedural rules so as to violate Boyd's constitutional due process protections.**

Boyd argues that the Commission violated his constitutional due process rights because the Commission did not follow its procedural rules found in HRS § 84-31(c) (2012 Repl.).[9] Specifically, Boyd contends that "Section 84-31(c), HRS, sets a twenty (20) day deadline to set a hearing following service of a Charge and a ninety (90) day deadline for the hearing to held [sic]" and the Commission failed to adhere to the deadline when it set Boyd's hearing "approximately one year and nine (9) months after the Charge was served on [him]." Boyd's interpretation of HRS § 84-31(c) as requiring the Commission to set a hearing within twenty days of service of the charge is without support from the statutory text.

HRS § 84-31(c) expressly provides

---

[8] (...continued)
public schools and entities of the State, neither a charter school nor the office may bring suit against any other entity or agency of the State.

[9]    HRS § 84-31 provides in relevant part:

(c) <u>If after twenty days following service of the charge and further statement of alleged violation in accordance with this section</u>, a majority of the members of the commission conclude that there is probable cause to believe that a violation of this chapter or of the code of ethics adopted by the constitutional convention has been committed, <u>then the commission shall set a time and place for a hearing, giving notice to the complainant and the alleged violator</u>. Upon the commission's issuance of a notice of hearing, the charge and further statement of alleged violation and the alleged violator's written response thereto shall become public records. <u>The hearing shall be held within ninety days of the commission's issuance of a notice of hearing</u>. If the hearing is not held within that ninety-day period, the charge and further statement of alleged violation shall be dismissed; provided that any delay that is at the request of, or caused by, the alleged violator shall not be counted against the ninety-day period.

(Emphases added.)

> (c) If <u>after</u> twenty days following service of the
> charge and further statement of alleged violation in
> accordance with this section, a majority of the members of
> the commission conclude that there is probable cause to
> believe that a violation of this chapter or of the code of
> ethics adopted by the constitutional convention has been
> committed, then the commission shall set a time and place
> for a hearing[.]

(Emphasis added.)

Thus, the language of the statute indicates that the Commission was to set a hearing no sooner than 20 days <u>after</u> formally charging Boyd. The Commission filed its Charge against Boyd on October 20, 2010 and its Further Statement of Alleged Violation on April 18, 2012. The Commission then filed its Notice of Hearing on July 5, 2012. Therefore, the Commission waited over twenty days after filing its Charge and Further Statement of Alleged Violation against Boyd to file its Notice of Hearing, so as to comply with the statutory requirements found in HRS § 84-31(c). If the Commission had filed its Notice of Hearing <u>within</u> twenty days of filing its Charge and Further Statement of Alleged Violation, as Boyd suggests, it would have set Boyd's hearing before Boyd was required to submit an Answer to the Commission's allegations, pursuant to HRS § 84-31(b), and the Commission would have been in violation of HRS § 84-31(c).

The Commission had six years from the time of the alleged violation in which to file a charge for violations of HRS chapter 84. HRS § 84-31(a)(6) provides in relevant part:

> (6) [The Commission] shall have jurisdiction for purposes
> of investigation and taking appropriate action on
> alleged violations of this chapter in all proceedings
> commenced within six years of an alleged violation of
> this chapter by a legislator or employee or former
> legislator or employee. A proceeding shall be deemed
> commenced by the filing of a charge with the
> commission or by the signing of a charge by three or
> more members of the commission.

The Commission alleges that Boyd committed several violations of the Code of Ethics between September 12, 2006 and June 21, 2007. On October 20, 2010, the Commission filed its first Charge against Boyd signed by four Commissioners. The Commission filed its Charge against Boyd within six years of Boyd's alleged violations, in compliance with HRS § 84-31(a)(6).

19

Therefore, the statute of limitations had not expired and the Commission had jurisdiction to charge Boyd for his violations.

**C.  The Commission did not violate Boyd's constitutional due process protection to a fair and impartial tribunal.**

Boyd contends the Commission "took on the simultaneous roles of prosecutor, judge, jury, and executioner in [Boyd's] case and prejudged the case[,]" in violation of his due process right to a fair and impartial tribunal.

In Sifagaloa v. Bd. of Trustees of Employees' Ret. Sys. of State of Hawaii, 74 Haw. 181, 840 P.2d 367 (1992), the Hawai'i Supreme Court noted that "a fair trial in a fair tribunal is a basic requirement of due process" and "applies to administrative agencies which adjudicate as well as to courts." Id. at 189, 840 P.2d at 371 (quotation marks and citation omitted). However, as a general rule, "(1) legislative enactments are 'presumptively constitutional;' (2) 'a party challenging a statutory scheme has the burden or showing unconstitutionality beyond a reasonable doubt;' and (3) the constitutional defect must be 'clear, manifest and unmistakable.'" Id. at 191, 840 P.2d at 371 (brackets omitted). HRS § 84-31 grants the Commission the power to both investigate and hold hearings on allegations of Code of Ethics violations. HRS § 84-31 is, therefore, presumptively constitutional and Boyd carries the burden to overcome the presumption. See Sifagaloa, 74 Haw. at 191, 840 P.2d at 371.

Boyd maintains the Commission was "inherently incapable of being fair and impartial" because the commission played both an investigatory and adjudicatory role in Boyd's case. The Sifagaloa court held that "[a]n appearance of impropriety does not occur simply where there is a joinder of executive and judicial power." Id. at 191, 840 P.2d at 372. This is because "[a]dministrators serving as adjudicators are presumed to be unbiased." Id. at 192, 840 P.2d at 372. The presumption can be rebutted by a showing of disqualifying interest, such as a pecuniary or institutional interest in the outcome of the case. See id. (citing Wolkenstein v. Reville, 694 F.2d 35, 42 (2d Cir. 1982)). However, "the burden of establishing a disqualifying interest rests on the party making the assertion." Id.

20

Here, Boyd fails to allege that any Commission member has a pecuniary or institutional interest in the outcome of his case. Therefore, Boyd fails to overcome the presumption that HRS § 84-31 is constitutional and fails to overcome the presumption that the Commission was unbiased in its adjudication of his case.

**D. The Commission was not required to prove that Boyd intended to violate the Code of Ethics.**

Boyd contends "[the Commission] was required to prove [Boyd] had actual knowledge of the applicable Chapter 84, HRS standards of conduct . . . <u>and</u> that he intentionally or knowingly violated those rules . . . ." (Emphasis in original.) The Commission held that Boyd had violated HRS § 84-14(a) and (d). Neither statutory provision, however, include intent or state of mind requirements. In fact, Hawai'i courts have held that "a law takes effect upon its passage, and mere ignorance of the law constitutes no defense to its enforcement." <u>Hirono v. Peabody</u>, 81 Hawai'i 230, 234, 915 P.2d 704, 708 (1996) (holding that a candidate for governor's claim that he did not know he was constitutionally required to run with a lieutenant governor from the same party was no defense to his violation of the constitutional requirement); <u>Office of Disciplinary Counsel v. Au</u>, 107 Hawai'i 327, 340, 113 P.3d 203, 216 (2005) (holding that lawyer's claims that "he was not aware that he was violating the [Hawai'i Rules of Professional Conduct]" was no defense to his violation of the rules); <u>In re Brandon</u>, 113 Hawai'i 154, 158, 149 P.3d 806, 810 (App. 2006) (holding that pro se litigant's claims that he did not know "that the adjudication of a timely motion for reconsideration was a prerequisite for an appeal under HRS § 271-32(e) and HRS § 271-33" was no defense to the pro se litigant's failure to adhere to the requirement). Thus, Boyd's argument that he did not know that, as a State employee, he was required to abide by the Code of Ethics is no defense to the Commission's charges.

**E. HRS § 84-14(a)(1) – Counts 1 to 9**

Boyd claims that the Commission failed to prove that he violated HRS § 84-14(a)(1) as alleged in Counts 1 through 9 because Principal Thatcher had final approval authority over the

21

purchases from Boyd's business for which Boyd prepared purchase orders and/or preliminarily approved. We disagree.

There was substantial evidence to support the Commission's finding that Boyd committed the violations of HRS § 84-14(a)(1) as alleged in Counts 1 through 9. HRS § 84-14(a)(1) provides:

> § **84-14 Conflicts of interest.** (a) No employee shall take any official action directly affecting:
>
> (1)     A business or other undertaking in which the employee has a substantial financial interest.

"Official action" is defined as "a decision, recommendation, approval, disapproval, or other action, including inaction, which involves the use of discretionary authority." HRS § 84-3 (2012 Repl.) (emphasis added). "Financial interest" is defined, in relevant part, as "an interest held by an individual, the individual's spouse, or dependent children which is: (1) An ownership interest in a business." Id. (format altered).

The evidence showed that Boyd recommended that purchases be made by Connections from Boyd's Amway distributor business by his actions in (1) preparing the purchase orders to order materials from his business and/or (2) granting preliminary approval for the purchases from his business. This evidence was sufficient to show that Boyd had taken "official action" by making recommendations involving the use of discretionary authority that Connections purchase materials from Boyd's own business. The evidence was also sufficient to show that Boyd's official actions directly affected his substantial financial interests. There was undisputed evidence that Boyd co-owned with his wife (as a sole proprietorship) the Amway distributor business from which Connections purchased the materials.

Boyd relies on Tangen v. State Ethics Comm'n, 57 Haw. 87, 550 P.2d 1275 (1976), to support his claim that the Commission's proof was insufficient because Principal Thatcher had final approval authority over the purchases from Boyd's businesses. However, Tangen is distinguishable.

For purposes of the conflict of interest provisions, Tangen was considered to be a State employee as a member of the Land Use Commission (**LUC**), and he was also employed by the

International Longshoremen's and Warehousemen's Union (**ILWU**). Tangen, 57 Haw. at 88-91, 550 P.2d at 1277-78. Tangen participated in voting on petitions before the LUC brought by landowners to reclassify to urban districts parcels of land located within agricultural or conservation districts. Id. at 89, 550 P.2d at 1277. The lessees of the petitioning landowners, and in one case the landowner itself, had collective bargaining contracts with the ILWU. Id. However, the ILWU was not the petitioner and did not own any interest in the lands sought to be rezoned in any of the cases before the LUC. Id. at 92, 550 P.2d at 1279.

The Hawai'i Supreme Court held that Tangen's participation as a Land Use Commissioner in proceedings concerning the rezoning petitions did not violate the conflict of interest laws.[10] Id. at 93, 550 P.2d at 1279. The supreme court stated that it was undisputed that Tangen, as a Land Use Commissioner, was considered to be a State employee and that his "participation in the activities and proceedings of the State [LUC] in the disposition of [the rezoning] petitions constituted official action." Id. at 91, 550 P.2d at 1278. The supreme court concluded that the dispositive issue was whether Tangen's official action directly affected a business or matter in which Tangen had a substantial financial interest.[11] Id.

In deciding this issue, the supreme court focused on whether action by the LUC on the rezoning petitions would directly affect the ILWU, Tangen's employer.[12] The court found it significant that "the ILWU was not the petitioner in these cases and did not own any interest in the lands sought to be

---

[10] Similar to HRS § 84-14(a)(1) at issue in this appeal, the statute at issue in Tangen provided in relevant part: "'No employee shall . . . (p)articipate, as an agent or representative of a state agency, in any official action directly affecting a business or matter in which . . . (h)e has a substantial financial interest.'" Tangen, 57 Haw. at 90-91, 550 P.2d at 1278 (capitalization altered).

[11] The supreme court noted that "[t]he usual and ordinary definition of 'directly' is 'without any intervening agency or instrumentality or determining influence.'" Id. at 92, 550 P.2d at 1279 (citation omitted).

[12] The supreme court assumed that Tangen had a substantial financial interest in the ILWU, as his employer. Id. at 92, 550 P.2d 1279.

rezoned by the State [LUC]." Id. at 92, 550 P.2d at 1279. In holding that Tangen's actions as a Land Use Commissioner did not directly affect his substantial financial interests as an employee of the ILWU, the supreme court reasoned:

> Action by the State [LUC] concerning changes in the classifications of land directly affects the petitioner who seeks changes in authorized uses of the land. In our view the effect such an action would have on persons or organizations other than the petitioner and those with financial interest in the land affected by such petition would be indirect, at the most. The agricultural workers [who were members of the ILWU] employed by the lessees of the landowners might be indirectly affected by the decisions of the State [LUC] in the subject cases, but this effect would turn not only upon the initial decision by the State [LUC], but also upon the intervening decisions of the landowners, i.e., to continue to lease their land for agriculture or to develop the land in other ways, and the intervening [decisions] of the lessee-employers in response thereto, i.e., to relocate, to cease business, etc.

Id. at 93, 550 P.2d at 1279.

The supreme court's analysis in Tangen shows that its focus was on the effect that the decision of the State entity (the LUC) would have on the participating individual's financial interests. The court held that Tangen's actions as a Land Use Commissioner did not violate the conflict of interest law because only the petitioners were directly affected by the [LUC's] decision on the rezoning petitions -- the effect on Tangen's employer (the ILWU) was indirect because it did not turn only upon the decision by the State entity. The court in Tangen did not address the issue presented by this case, namely, whether the conflict of interest prohibition set forth in HRS § 84-14(a)(1) is inapplicable whenever another person has final approval authority over the State entity's decision.

Unlike in Tangen, the effect of the decision by the State entity (Connections) on Boyd's business was direct because it did not turn on any contingencies or intervening factors. Connection's decision on whether to purchase materials from Boyd's business directly affected Boyd's business. As a direct result of Connections' decision, in which Boyd was a significant participant, Boyd's business received money from Connections for the materials purchased. Boyd's interpretation of HRS § 84-14(a)(1) as being inapplicable whenever another person has final approval authority over the State entity's decision would render

superfluous the inclusion of the term "recommendation" in the definition of "official action." Under Boyd's reading of HRS § 84-14(a)(1), a person who participates in a State entity's decision by making a recommendation that is approved by another person could never violate HRS § 84-14(a)(1).

We reject this reading because it contravenes a cardinal rule of statutory construction "that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." E.g., Coon v. City and Cnty. of Honolulu, 98 Hawaiʻi 233, 259, 47 P.3d 348, 374 (2002). We also reject this reading because it would create a significant loophole in the conflict of interest laws and lead to absurd and unjust results by exempting large categories of self-dealing by State employees. See Schmidt v. HSC, Inc., 131 Hawaiʻi 497, 508, 319 P.3d 416, 427 (2014) (concluding that statutes should be construed to avoid "an absurd and unjust result obviously inconsistent with the purposes and policies of the statute"). Tangen did not analyze the phrase "directly affecting" under the circumstances presented by this case and did not address the inclusion of the term "recommendation" in the definition of "official action."

We conclude that Tangen is distinguishable and does not control our decision in this case. While there may be situations in which a State employee's participation through official action in the State entity's decisions is so minimal that it cannot be found to have directly affected the employee's substantial financial interests, this is not one of those situations. Boyd, through his official actions in recommending purchases from his own business, played a significant role in Connections' decisions to purchase materials from his business. We conclude that there was substantial evidence to support the Commissions' determination that Boyd committed the violations alleged in Counts 1 through 9.

25

**F. HRS § 84-14(d) - Counts 10 to 20**

The Commission found Boyd guilty of Counts 10 through 20, in violation of HRS § 84-14(d), for allegedly receiving compensation for eleven separate transactions that he facilitated between Connections and Boyd Enterprises. The circuit court reversed the Commission's holding and held that "[t]he fact that Boyd may have received money from the transactions does not mean that he received 'compensation' as defined under HRS § 84-3." Specifically, the court rested its determination on the fact that the Commission made "no finding of fact that Boyd received money specifically in exchange for signing the Food Services Certificates."

In this appeal, the Commission contends the circuit court erred because there was sufficient evidence in the record to support a finding that Boyd received compensation for signing the Food Services Certificates, so to violate HRS § 84-14(d). In response, Boyd reiterates the argument he made before the circuit court and contends the Commission provided insufficient evidence to support its conclusion that he received any compensation from signing the Food Service Certificates because all checks from Connections were made out to his wife, Erika.

HRS § 84-14(d) provides:

> (d) No legislator or employee shall assist any person or business or act in a representative capacity for a fee or other compensation to secure passage of a bill or to obtain a contract, claim, or other transaction or proposal in which the legislator or employee has participated or will participate as a legislator or employee, <u>nor shall the legislator or employee assist any person or business or act in a representative capacity for a fee or other compensation on such bill, contract, claim, or other transaction or proposal before the legislature or agency of which the legislator or employee is an employee or legislator.</u>

HRS § 84-3 defines "compensation" as "money, thing of value, or economic benefit conferred on or received by any person in return for services rendered or to be rendered by oneself or another."

Boyd's claim that he was not culpable because he did not personally receive any economic benefits is without merit. The record indicates that Boyd signed eleven Food Service Certificates, as a representative of Boyd Enterprises, so that

26

Boyd Enterprises could be repaid for services rendered to Connections. Boyd was the co-owner of Boyd Enterprises and therefore directly benefitted from payments made to Boyd Enterprises. The record further indicates, and Boyd does not dispute, that Connections did in fact pay Erika to settle the amounts owed to Boyd Enterprises. Therefore, Connection's payment to Erika constituted "compensation" to Boyd for which Boyd is culpable.

In addition, the Commission was not required to find in its FOF/COL that Boyd "received money specifically in exchange for signing the Food Services Certificates[,]" as the circuit court's Order suggests. "Where an appellant alleges that the trial court failed to make adequate findings of fact, the appellate court will examine all the findings, as made, to determine whether they are (1) supported by the evidence; and (2) sufficiently comprehensive and pertinent to the issues in the case to form a basis for the conclusions of law." Nani Koolau Co. v. K & M Const., Inc., 5 Haw. App. 137, 140, 681 P.2d 580, 584 (1984).[13] "If those findings include sufficient subsidiary facts to disclose to the reviewing court the steps by which the lower court reached its ultimate conclusion on each factual issue, then the findings are adequate." Id.; see John Wilson Enterprises, Ltd. v. Carrier Terminal Serv., Inc., 2 Haw. App. 128, 130, 627 P.2d 294, 295 (1981); Tugaeff v. Tugaeff, 42 Haw. 455, 467 (Haw Terr. 1958).

First, the record and FOF/COL adequately supports a finding that Boyd received "compensation" in exchange for signing the Food Service Certificates so that a further finding was not required. The signed Food Service Certificates constituted invoices that identified what services Boyd Enterprises rendered to Connections (i.e., providing school lunches) and how much money was owed to Boyd Enterprises for the services rendered. During the hearing before the Commission, Kelley specifically testified that the eleven check stubs made out to Erika reflect

---

[13] Although Boyd did not argue insufficiency of the findings of fact below, the circuit court sua sponte held that the Commission's findings of fact failed to support a determination that Boyd received "compensation" for his services.

27

payment of the eleven Food Service Certificates that Boyd signed on behalf of Boyd Enterprises. Thus the record indicates that in return for assisting Boyd Enterprises by signing the Food Service Certificates, Boyd received compensation in the form of payments to Boyd Enterprises (via checks made out to Erika) from which Boyd benefitted as the co-owner of Boyd Enterprises.

Second, the Commission's findings of fact were sufficiently comprehensive and pertinent to support the Commission's conclusion of law that Boyd had violated HRS § 84-14(d). The Commission's FOF/COL methodically laid out the facts that support a finding of Boyd's guilt as to each HRS § 84-14(d) violation. The Commission specifically found that

33. Count 10:

. . . .

(d) On or about January 25, 2007, Connections paid $453.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 151 lunches provided by Boyd Enterprises. . . .

34. Count 11:

. . . .

(e) On or about February 7, 2007, Connections paid $450.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 150 lunches provided by Boyd Enterprises. . . .

35. Count 12:

. . . .

(e) On or about February 9, 2007, Connections paid $468.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 156 lunches provided by Boyd Enterprises. . . .

36. Count 13:

. . . .

(e) On or about February 20, 2007, Connections paid $468.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 156 lunches provided by Boyd Enterprises. . . .

37. Count 14:

. . . .

(e) On or about March 2, 2007, Connections paid $432.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 144 lunches provided by Boyd Enterprises. . . .

38. Count 15:

. . . .

(e) On or about March 9, 2007, Connections paid $447.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 149 lunches provided by Boyd Enterprises. . . .

39.  Count 16:

. . . .

(e) On or about April 5, 2007, Connections paid $456.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 152 lunches provided by Boyd Enterprises. . . .

40.  Count 17:

. . . .

(e) On or about April 19, 2007, Connections paid $909.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 303 lunches provided by Boyd Enterprises. . . .

41.  Count 18:

. . . .

(e) On or about May 10, 2007, Connections paid $306.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 102 lunches provided by Boyd Enterprises. . . .

42.  Count 19:

. . . .

(e) On or about May 31, 2007, Connections paid $975.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 325 lunches provided by Boyd Enterprises. . . .

43.  Count 20:

. . . .

(e) On or about June 22, 2007, Connections paid $165.00 to Erika Boyd, co-owner of Boyd Enterprises, for the 55 lunches provided by Boyd Enterprises.

Given that the Commission's findings of fact were supported by the record and sufficiently comprehensive to disclose to the reviewing court the steps by which the Commission reached its ultimate conclusion on each factual issue, we hold that the Commission's findings of fact were adequate.  Therefore, the circuit court erred in reversing in part the FOF/COL, as it pertains to Boyd's HRS § 84-14(d) violations.

G.  **The Commission did not behave arbitrarily, capriciously, or abuse its discretion.**

Boyd contends "[the Commission], through the actions of its Chairperson, Maria Sullivan, acted in an arbitrary, capricious and in a biased and prejudiced manner that was indicative of an abuse of discretion and clearly unwarranted

exercise of discretion." Boyd further contends that "[a]ppellee's Chairperson had already made up her mind about the [Boyd's] guilt and made every effort to insure his conviction." Boyd cites to no legal authority and instead relies upon blanket accusations in support of his argument on appeal. Given our previous determination that the Commission was a fair and impartial tribunal, we hold that Boyd's argument that the that Commission "acted in an arbitrary, capricious and in a biased and prejudiced manner" towards him is without merit.

## IV. CONCLUSION

We affirm in part and reverse in part the October 7, 2013 "Decision and Order Affirming In Part And Reversing In Part Hawaii State Ethics Commission's Findings of Fact, Conclusions of Law And Decision And Order," entered in the Circuit Court of the Third Circuit. We remand this case to the Circuit Court of the Third Circuit to enter final judgment affirming the February 8, 2013 Hawaii State Ethics Commission's "Findings Of Fact, Conclusions Of Law, And Decision And Order."

On the briefs:

Ted H.S. Hong
for Appellant/Appellee/
Cross-Appellant.

Kimberly Tsumoto Guidry
First Deputy Solicitor General
for Appellee/Appellant/
Cross-Appellee.

*Craig H. Nakamura*

*Daniel R. Foley*

*Lawrence M Reifurth*